**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| CHARLESTON WATERKEEPER, SOUTH CAROLINA COASTAL CONSERVATION LEAGUE,<br><br>Plaintiffs,<br><br>v.<br><br>FRONTIER LOGISTICS, L.P.,<br><br>Defendant. | ) | C.A. No. 2:20-CV-01089-DCN |

**PLAINTIFFS CHARLESTON WATERKEEPER AND SOUTH CAROLINA COASTAL CONSERVATION LEAGUE'S OPPOSITION TO DEFENDANT FRONTIER LOGISTICS, L.P.'S MOTION FOR JUDGMENT ON THE PLEADINGS**

## INTRODUCTION

Frontier Logistics, L.P. ("Frontier"), is a packager of small, BB-sized plastic pellets operating at Union Pier Terminal in downtown Charleston, South Carolina ("Union Pier facility"). The Charleston Waterkeeper ("Waterkeeper") and the South Carolina Coastal Conservation League ("Conservation League") (collectively, "Plaintiffs"), consistent with their missions to protect the waters of Charleston and keep them free from pollution, began a months-long investigation into plastic pellet pollution in the Charleston region last summer, after massive numbers of pellets washed ashore on Sullivan's Island and Isle of Palms in July 2019. This investigation was an exhaustive effort which involved extensive pellet sampling in Charleston Harbor and beyond, data collection and analysis, chemical testing, and public records requests. Months of sampling data revealed that the highest concentrations of plastic pellets in the region are consistently found within a few hundred feet of the Union Pier facility, and chemical analysis

verified that those pellets match the type of plastic handled by Frontier. Based on the evidence amassed, Plaintiffs believe that the July 2019 spill was no one-time occurrence, but is an ongoing problem at the Union Pier facility, from which Frontier has for years spilled, and continues to spill, pellets into the Cooper River and onto nearby property.

On March 18, 2020, nearly eight months into their investigation, Plaintiffs filed this action against Frontier alleging that the company's plastic pellet spills violate the Resource Conservation and Recovery Act ("RCRA") and the Clean Water Act ("CWA").[1] Plaintiffs were left to take this action when the South Carolina Department of Health and Environmental Control ("DHEC") declined to enforce the law, despite identifying Frontier as the suspected source of the July 2019 spill. DHEC's failure is all the more glaring given that Frontier's pollution remains in Charleston-area waters and on local beaches to date.

Frontier filed the instant motion to dismiss Plaintiffs' case before it had even answered Plaintiffs' first set of Requests for Production, Requests for Admission, and Interrogatories. In fact, discovery has barely commenced and runs through March 2021. Dkt.#19. Frontier, through its Rule 12(c) motion, asks this Court to prejudge the outcome of this discovery process and, more glaringly, to find all facts in its favor now. But to prevail on a motion under Rule 12(c), it is Frontier's burden to demonstrate, beyond doubt, that Plaintiffs cannot prove *any set of facts* that would justify relief. Over the course of its 35-page motion, Frontier continually misapplies this standard and takes issue with the veracity of Plaintiffs' allegations. Frontier argues that people who recreate on waters and beaches littered with plastic pellets are not harmed by these spills; that past and present pellet spills are not traceable to its Union Pier facility; that pellet pollution poses no endangerment to the environment; and that its violations are not ongoing

[1] During this eight month period, Plaintiffs submitted the required 60- and 90-day notices of their intent to sue Frontier as required by the CWA and RCRA, respectively.

despite continued discoveries of pellets in Charleston Harbor near its facility. Frontier's motion also repeatedly misstates and misapplies the legal requirements Plaintiffs must satisfy to maintain claims under RCRA and the CWA. For example, Frontier claims that its pellet pollution is not "solid waste" as a matter of law. The Court should deny the motion in full and allow the parties to proceed to discovery so that Plaintiffs may continue to gather the evidence needed to prove their allegations.

## STANDARD OF REVIEW

Under Rule 12(c) of the Federal Rules of Civil Procedure, "[a]fter the pleadings are closed . . . a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Rule 12(c) "operate[s] to dispose of cases in which there is *no substantive dispute* that warrants the litigants and the court proceeding further." *Thomas Daniels Agency, Inc. v. Nationwide Ins. Co. of Am.*, 122 F. Supp. 3d 448, 450 (D.S.C. 2015) (emphasis added) (internal quotations and citation omitted). "A judgment on the pleadings is only warranted if the moving party has *clearly established* that *no material issue of fact* remains to be resolved and the party is entitled to judgment as a matter of law." *Id.* (emphasis added) (internal quotations and citation omitted). When deciding a Rule 12(c) motion, courts apply the same standard as a motion to dismiss under Rule 12(b)(6). *Independence News, Inc. v. City of Charlotte*, 568 F.3d 148, 154 (4th Cir. 2009).[2] The court must accept a complaint's allegations as true and construe them in the light most favorable to the non-moving party. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). To survive a Rule 12(b)(6) motion, a complaint need only "contain sufficient factual matter,

[2] The primary difference is that, on a Rule 12(c) motion, the court may consider the answer in addition to the complaint, although factual allegations in the answer "are taken as true only where and to the extent they have not been denied or do not conflict with the complaint." *Alexander v. City of Greensboro*, 801 F. Supp. 2d 429, 433 (M.D.N.C. 2011) (citation omitted).

accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citation omitted). Plausibility is central to the court's review, and the Supreme Court has explained this standard as follows:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.

*Id.* (internal quotations and citation omitted). Further, a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

## ARGUMENT

Frontier's motion is "devoted to arguing facts, which is improper in the context of a motion for judgment on the pleadings." *Toll Bros., Inc. v. Gore*, No. 3:07CV92, 2008 WL 11344681, at *3 (N.D. W. Va. Oct. 15, 2008); *see also Ward v. Stucke*, 395 F. Supp. 3d 940, 952 (S.D. Ohio 2019); *Spurgeon v. Swift Group, LLC*, No. 11-1807, 2012 WL 243211, at *2 (W.D. La. 2012). Along with Frontier's earlier Answer, the motion fails to establish that no set of facts could justify relief here. Instead, Frontier improperly asks the Court to find that Plaintiffs' allegations regarding their members' standing to sue are false; that its pellet pollution is neither ongoing nor a threat to the environment; and that, as a legal matter, it is not subject to suit under RCRA. All of these arguments are flawed and must be rejected.

### I. Plaintiffs Have Sufficiently Pled Allegations to Demonstrate Standing.

Frontier first argues that it is entitled to judgment on the pleadings because Plaintiffs have "failed to *establish* they have standing to bring either a RCRA or a CWA claim against Frontier." Dkt.#23-1 at 8 (emphasis added). But the applicable standard does not require Plaintiffs to *establish* standing when the complaint is filed but, rather, to plead sufficient facts that would, if

proven, establish standing at a later point. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 65 (1987) ("[A] suit will not be dismissed for lack of standing if there are sufficient allegations of fact—not proof—in the complaint or supporting affidavits." (internal quotations omitted)). While Frontier spends page upon page elaborating general principles of standing law, it has wholly failed to explain how Plaintiffs' factual allegations on standing are deficient under the liberal standard governing this motion.

Frontier fails to make this argument because the Complaint easily surpasses the hurdle to plead sufficient facts on standing. *See* Dkt.#1, ¶¶ 11-14. In the Complaint, Plaintiffs alleged:

- Plaintiff organizations and their members have significant, particularized, and concrete interests in preventing Frontier's pollutant discharges from the Facility and the resulting endangerment to the environment. *Id.* at ¶ 13.

- Plaintiffs' members live near, recreate on, and regularly visit the Cooper River and other Charleston waters and beaches harmed by Frontier's discharges, and intend to recreate on and visit these waters and beaches in the future. *Id.*

- These individuals use and enjoy Charleston waters and beaches for recreational, commercial, educational, conservation, and aesthetic purposes, including, but not limited to, boating, scuba diving, swimming, fishing, and sightseeing. *Id.*

- Frontier's ongoing discharges from the Facility harm Plaintiffs' members in part because these discharges contain pollutants that are known to be harmful to wildlife and to persist in the environment. These harms fall within the zone of interests protected by RCRA and the CWA. *Id.*

- Relief from this Court addressing Frontier's non-compliance with RCRA and the CWA would redress the injuries of Plaintiff organizations and their members by increasing the likelihood, if not ensuring, that Frontier will cease its pollutant discharges and eliminate the endangerment to the environment. *Id.* at ¶ 14.

Aside from general recitations of standing law, Frontier fails to cite a single analogous case where a Court has granted a Rule 12(c) motion on standing. In fact, given the liberal standard of Rule 12(c), courts routinely deny such motions. *See, e.g.*, *Joe Hand Promotions, Inc.*

*v. Roseville Lodge No. 1293, Loyal Order of Moose, Inc.*, 2014 WL 4930695, at *3 (E.D. Cal. Sept. 29, 2014) ("Given Plaintiff has sufficiently alleged standing, Defendant's Rule 12(c) motion is denied."); *De Walshe v. Togo's Eateries, Inc.*, 567 F. Supp. 2d 1198, 1205 n.3 (C.D. Cal. 2008) ("[U]nder the forgiving standard for Rule 12(c) motions, it was possible that Plaintiff could allege facts sufficient to demonstrate his standing."); *United States v. 328 Pounds More or Less, of Wild Am. Ginseng*, 347 F. Supp. 2d 241, 248 (W.D.N.C. 2004) (denying Rule 12(c) motion when forfeiture claimants "have satisfied their burden under a Rule 12(c) motion and can prove facts entitling them to standing to challenge the forfeiture proceeding"); *FTD Corp. v. Banker's Tr. Co.*, 954 F. Supp. 106, 108 (S.D.N.Y. 1997). The court must do the same here.

**A. Plaintiffs have adequately alleged injuries.**

Turning to the three prongs of the standing inquiry, Frontier correctly explains that standing ultimately requires Plaintiffs to establish injury-in-fact, traceability, and redressability. Dkt.#23 at 8 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). For injury purposes, the "relevant showing . . . is not injury to the environment but injury to the plaintiff." *Id.*; *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). "In the environmental litigation context, the standing requirements are not onerous. '[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity.'" *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003) (quoting Laidlaw, 528 U.S. at 183). Frontier tacitly admits that Plaintiffs have "generally alleged" claims of injury, Dkt.#23-1 at 8, 11, and this alone is enough to require denial of Frontier's motion. *See, e.g., Joe Hand*, 2014 WL 493069, at *3.

Frontier takes issue not with Plaintiffs' allegations of injury, but rather, with the *types* and *degree* of these injuries. According to Frontier, Plaintiffs' injuries are not sufficient, even at the pleading stage, because they are "broad and generalized" and "cover virtually every aspect of outdoor life in a coastal community." Dkt.#23-1 at 11. Frontier further complains that Plaintiffs have failed to demonstrate that their members have a geographic nexus to the site, and that Plaintiffs cannot complain about plastic pellet pollution because they sought it out. *Id.* at 12 (arguing that "when Plaintiffs or their members go searching for pellets, they are not pursuing aesthetic interests that are then lessened by pollution, but rather are pursuing their interest in locating pollution").

Again, Plaintiffs' claims of injury in paragraph 13 of the Complaint are clearly sufficient to withstand a Rule 12(c) motion. *See Lujan*, 504 U.S. at 561 ("[G]eneral factual allegations of injury resulting from the defendant's conduct may suffice" because the Court "presume[s] that general allegations embrace those specific facts that are necessary to support the claim."). And while the Court need not reach details on the types and degree of injuries claimed, Frontier's assertions regarding Plaintiffs' members' injuries are baseless. Plaintiffs' members did not originally go searching for plastic pellets, but encountered plastic pellets in the normal course of their recreational and aesthetic activities in and around Charleston Harbor. For example, Waterkeeper member Joy Krutek explains that she went to Sullivan's Island on July 19, 2019, to "enjoy a leisurely day at the beach." *See* Ex. 1, Krutek Decl., ¶ 5.[3] What Ms. Krutek found when

---

[3] In evaluating Plaintiffs' standing at this stage, the Court may consider not only the allegations in the Complaint, but also factual averments made by affidavit. In *Warth v. Seldin*, 422 U.S. 490, 501-02 (1975), the Supreme Court stated:

> For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party. At the same time, it is within the trial court's power to allow or to require the plaintiff to

she arrived there "shocked" her: "Thousands upon thousands of tiny plastic pellets were scattered along the high tide line. This immediately disrupted the purpose of my visit because I could no longer sit and enjoy the natural scenery of the beach without focusing on this pollution." *Id.* She continues to visit Sullivan's Island and finds plastic pellets "in alarming quantities" each time she goes. *Id.* at ¶ 7. Similarly, when Conservation League member David Creech took his dog for a walk on Sullivan's Island on July 19, 2019, he "was immediately struck by the thousands of small, white beads that had collected along the high tide line." *See* Ex. 2, Creech Decl., ¶ 5. Waterkeeper member John Irwin similarly "observed dozens of pellets on Morris Island in early March while hunting for shark's teeth with my children." *See* Ex. 3, Irwin Decl., ¶ 6 (also explaining that "[i]t was disturbing to see so many of the tiny beads mixed in with seashells on this otherwise pristine, undeveloped island").

Plaintiffs' injuries are also not too "generalized" or part of "virtually every aspect of outdoor life in a coastal community." Dkt.#23-1 at 11. "[S]tanding is not to be denied simply because many people suffer the same injury." *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 687 (1973). If an individual's injury is sufficiently personal, it is not defeated because others are harmed as well. *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998); *see also Pye v. Unite States*, 269 F.3d 459, 469 (4th Cir. 2001) ("[M]erely because an injury is widely held does not necessarily render it abstract and thus not judicially cognizable . . . . So long as the plaintiff himself has a concrete and particularized injury, it does not matter that legions of other persons have the same injury."). Plaintiffs' members here have clearly suffered personal injuries in encountering plastic pellets during their

---

> supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing.

(internal citation omitted).

recreational pursuits on the beaches and in the waters of Charleston. *See* Exs. 1-3. It is of no moment that other members of the public are also exposed to this unlawful pollution. In sum, the Complaint sufficiently alleges that Plaintiffs' members use and enjoy areas affected by plastic pellet pollution, and that plastic pellet pollution injures their aesthetic and recreational enjoyment of these areas. No more is required of Plaintiffs at this early stage in the litigation.

**B. Plaintiffs have adequately alleged traceability of their injuries to Frontier.**

Frontier next argues that it is entitled to dismissal because Plaintiffs have "failed to establish" that their injuries are traceable to Frontier. Dkt.#23-1 at 13. As with its arguments on injury, Frontier would again have this court misapply the Rule 12(c) standard, which merely measures whether Plaintiffs have adequately pled traceability, not whether they have conclusively *established* it. Frontier argues that Plaintiffs' case should be dismissed because "[whether] the collected pellets came from Frontier's UPT facility is a matter of pure speculation," and because Plaintiffs cannot establish traceability based merely on "proximity." Dkt.#23-1 at 14. Despite citing *NRDC v. Watkins*, 954 F.2d 974 (4th Cir. 1992), for the proposition that a plaintiff "need not show that a particular defendant is the only cause of their injuries," Frontier also finds fault with Plaintiffs for allegedly not "conduct[ing] any investigation into the source of the pellets to the extent they derived from a source other than Frontier's UPT facility." Dkt.#23-1 at 14.

Frontier's motion asks the Court to pre-judge the ultimate merits question of whether Frontier is responsible for plastic pellet pollution in Charleston without the benefit of discovery, expert testimony, or any further motions practice. *See Brown v. Medtronic, Inc.*, 628 F.3d 451, 457 (8th Cir. 2010) (cautioning not to "conflate the injury and traceability requirements of a standing analysis with the plaintiff's ultimate burden of proof as to the issues of damages and

causation at a trial on the merits."); *Idaho Rural Council v. Bosma*, 143 F.Supp.2d 1169, 1172 (D. Idaho 2001) (causal connection need not be so "airtight at this stage so as to demonstrate that plaintiffs would succeed on the merits"). In addition to employing the wrong standard, Frontier's factual assertions are again wrong. The Complaint is filled not with "pure speculation," but with paragraph upon paragraph of allegations sufficient to infer that Frontier is at least a significant source of the plastic pellet pollution injuring Plaintiffs' members. These allegations are based on far more than mere "proximity." For example, the Complaint cites a DHEC site visit at the Union Pier facility in July 2019, during which DHEC noted that:

> [n]umerous areas of concern were observed. See photo log/image map in docs. Sample obtained during time of site visit. Plastic accumulation observed throughout facility. Most of the facility is located over water. Numerous openings throughout facility were observed directly over water.

Dkt.#1, ¶ 36. DHEC staff also observed that the pellets at the facility appeared to resemble the pellets present on Sullivan's Island. *See id.* The Complaint referenced photographs taken by DHEC staff during that site visit showing plastic pellets spilled along the rail lines, in seams between concrete slabs, beneath the truck loading dock, and inside a screened grate. *See id.*; Dkt.#1-1 at 175-207. The Complaint explains that many of these spilled pellets were in close proximity to openings in the facility that empty directly into or immediately adjacent to the Cooper River. *See id.*

The Complaint also includes data from nearly eight months of sampling conducted by Waterkeeper after this plastic pellet pollution was discovered. While Frontier would have this Court believe that Plaintiffs were on a witch hunt, Dkt.#23-1 at 25, their sampling effort in fact spanned a vast geographic area—as far north as Cape Romain National Wildlife Refuge, as far south as Hilton Head Island, and as far inland as Moncks Corner, Dkt.#1, Figure 2 at 13-19. By far the highest concentrations of pellets were found *consistently* at the two sites nearest to the

Union Pier facility. *Id.* at ¶ 53. The sampling results, all displayed in the Complaint, demonstrate exceedingly few pellets elsewhere along the South Carolina coast and the Cooper River. *Id.*, Figure 2 at 13-19. In addition to eight months of sampling, the Complaint explained that Waterkeeper has collected plastic pellets along the fence line of the Union Pier facility, which appear to have been carried there by wind or stormwater from the facility, *id.* at ¶ 54, and which resemble the pellets recovered from Charleston waters, *id.* at ¶ 55. In general, the pellets are uniform in size, clear or opaque white in color, and one of four shapes (round, square, cylindrical, or disk-like). *Id.* Finally, before filing their Complaint, Plaintiffs commissioned Fourier-Transform Infrared Spectroscopy ("FTIR") analysis of 10 recovered pellets—six from Charleston waters and four from the rail line entering the Facility—which verified that all 10 of the pellets were polyethylene, the type of plastic handled by Frontier. *Id.* at ¶ 56.

In sum, Frontier's claim that Plaintiffs "attribute traceability merely by proximity" is disingenuous at best. Dkt.#23-1 at 15. Plaintiffs have done far more than required to plead traceability at this point in the litigation.[4] As to Frontier's repeated assertions that there are other entities handling plastic pellets in the larger Charleston area, *id.*, Frontier has notably refused to name such entities or disclose their locations. In any case, Frontier is wrong that, to demonstrate

---

[4] Of course, Plaintiffs intend to further probe the mechanisms of pellet release and transport during discovery, including with the assistance of expert witnesses. Frontier's repeated citation to *Center for Biological Diversity v. EPA*, 937 F.3d 533, 545 (5th Cir. 2019), for the proposition that "a petitioner's injury is a fact-specific inquiry that turns on many factors, including the size of the waterway, the proximity of the source and the injury, forces like water currents, and whether discharges will evaporate or become diluted," is misplaced at this stage in this litigation. *Center for Biological Diversity* resolved the question of standing at the merits stage in a case judged upon the administrative record, not in a case such as this in which discovery has only just begun. Nevertheless, based on the evidence collected to date and the breadth of Waterkeeper's sampling, Frontier's "other source" theory is ironic in that the vast majority of pellets collected are consistently found nearest the Union Pier facility and not near other known handlers of plastic pellets in Charleston.

traceability, Plaintiffs must "[seek] out any of these other entities to determine if they are the sources of the pellets that have been found." *Id.* Plaintiffs need only demonstrate that Frontier is one source of their injuries, which Plaintiffs have alleged adequately at this stage. *See, e.g.*, *Watkins*, 954 F.2d at 980.

**C. Plaintiffs have adequately alleged redressability.**

Frontier next argues that Plaintiffs' case should be dismissed because the claims are not redressable by this Court. Frontier again admits that Plaintiffs have made allegations regarding redressability, *see* Dkt.#23-1 at 16 (citing Dkt.#1, ¶ 14), but again takes issue with the veracity of Plaintiffs' pleadings. Frontier's argument hinges on the premise that DHEC has closed its investigation into the July 2019 spill, and that the Court can thus award no further relief. *See id.*

Establishing redressability is a low bar; a plaintiff must only show that "the injury will likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 167 (1997). Plaintiffs easily satisfy this standard. While Frontier claims that there are no ongoing discharges, Plaintiffs disagree based on the sampling data noted above and the apparent inadequacies in the containment and housekeeping procedures at the Union Pier facility, and intend to conduct discovery on this subject. *See supra* at 10-11; *infra* at 23. Moreover, Plaintiffs' claims do not hinge on ongoing discharges, but would be redressable by this Court even if pellets were no longer discharged from the Union Pier facility. *See infra* at 16-17, 26 n.15. The fact that DHEC conducted a non-public administrative investigation into Frontier and has "closed" this investigation is of no moment to either the CWA claim or the RCRA claim at issue here. Rather, this action may proceed because the state is not diligently prosecuting Frontier. *See, e.g.*, *Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743, 755 (7th Cir. 2004) (state action did not bar a citizen suit under the CWA when there was no notice and public

participation); *La. Envtl. Action Network v. Sun Drilling Products*, 716 F. Supp. 2d 476, 481 (E.D. La. 2010) (issuing a warning letter and opening an investigation did not qualify as commencement of an action); *Tobyhanna Conservation Ass'n v. Country Place Waste Treatment Co.*, 734 F. Supp. 667, 669–70 (M.D. Pa. 1989) (an administrative conference with a polluter, absent public notice or hearing procedures, did not bar a citizen suit).[5] Plaintiffs' members' injuries are redressable by a Court order requiring Frontier's pollution to cease and/or imposing appropriate injunctive and remedial relief to abate the ongoing endangerment to the environment. *See* Dkt.#1 at 25-26.

## II. **The Complaint Sufficiently Alleges That Frontier's Plastic Pellet Spills May Present an Imminent and Substantial Endangerment Under RCRA.**

Enacted in 1976, RCRA aimed to "eliminate[] the last remaining loophole in environmental law, that of unregulated land disposal of discharged materials and hazardous wastes." *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 874 F.3d 1083, 1089 (9th Cir. 2017) (quoting H.R. Rep. No. 94-1491, at 4 (1976)) (alterations in original). Like other environmental statutes, RCRA contains a citizen suit provision authorizing private citizens to enforce the law in some circumstances, including:

> against any person . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous

---

[5] For this reason, Frontier's citation to *Ailor v. City of Maynardville*, 368 F.3d 587 (6th Cir. 2004), is unavailing. In *Ailor*, before the complaint was filed, the City and the Tennessee Water Quality Control Board "had not only entered into, but enforced, an Order requiring the City to implement a corrective action plan to bring it into compliance with the CWA." *Id.* at 599. Therefore, "the State had *not* 'failed to exercise [its] enforcement responsibility.'" *Id.* (quoting *Gwaltney*, 484 U.S. at 61). By contrast, DHEC opened and closed an investigation into Frontier without any formal charges or penalties or any public involvement. Because the agency failed to exercise its enforcement responsibility, the instant action does not "supplant[] enforcement by state and federal government agencies." *Id.* at 590-91.

> waste which may present an imminent and substantial endangerment to health or the environment[.]

42 U.S.C. § 6972(a)(1)(B). In light of "RCRA's broad language and remedial purpose," courts have given this "endangerment provision" an expansive construction. *Fresh Air for the Eastside, Inc. v. Waste Mgmt. of N.Y., LLC*, 405 F. Supp. 3d 408, 439 (W.D.N.Y. 2019); *see also Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 210 (2d Cir. 2009); *Davis v. Sun Oil Co.*, 148 F.3d 606, 609 (6th Cir. 1998). Therefore, "if an error is to be made in applying the endangerment standard, the error must be made *in favor of protecting public health, welfare and the environment*." *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 259 (3d Cir. 2005) (emphasis added) (citation omitted).

Courts have "emphasized the preeminence of the word 'may' in defining the degree of risk needed" to maintain an endangerment claim. *Me. People's All. v. Mallinckrodt, Inc.*, 471 F.3d 277, 288 (1st Cir. 2006). The word "may," combined with the word "endangerment," contemplates only "a threatened or potential harm, and does not require proof of actual harm." *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1015 (11th Cir. 2004); *see also Mallinckrodt*, 471 F.3d at 296. The words "imminent" and "substantial" have similarly broad meanings. "Imminence generally has been read to require only that the harm is of a kind that poses a near-term threat; there is no corollary requirement that the harm necessarily will occur or that the actual damage will manifest itself immediately." *Mallinckrodt*, 471 F.3d at 288 (citing *Cox v. City of Dallas*, 256 F.3d 281, 299-300 (5th Cir. 2001)). Finally, an endangerment is "substantial" when "there is reasonable cause for concern that someone or something may be exposed to risk of harm" absent remedial action. *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1021 (10th Cir. 2007). Where all elements are present, courts have "broad authority . . . to grant all relief necessary to ensure complete protection of the public health and the

environment." *Little Hocking Water Ass'n, Inc. v. E.I. du Pont Nemours & Co.*, 91 F. Supp. 3d 940, 952 (S.D. Ohio 2015) (internal quotations and citation omitted); *see also Meghrig v. KFC W., Inc.*, 516 U.S. 479, 479 (1996).

**A. The Complaint establishes a strong evidentiary link between Frontier and the plastic pellets in the environment.**

Rehashing its standing arguments, Frontier claims that the Complaint failed to "allege facts sufficient to make an evidentiary link between the pellets that are handled at Frontier's facility and the pellets it has collected from Charleston waters and beaches." Dkt.#23-1 at 23. However, as described above, *see supra* at 9-12, Plaintiffs have exceeded their burden to plead a causal link between Frontier and the plastic pellets in the environment, *Iqbal*, 556 U.S. at 687. Before filing their complaint, Plaintiffs reviewed public records from DHEC's investigation into Frontier, including photographs showing the Union Pier facility littered with plastic pellets; they conducted eight months of sampling in Charleston Harbor and beyond revealing the highest concentrations of pellet pollution immediately adjacent to the facility; and they found pellets along the facility fence line that visually and chemically match pellets recovered from the environment. *See supra* at 11. This evidence plainly "allows the [C]ourt to draw the reasonable inference that [Frontier] is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 687. Plaintiffs must now have an opportunity to continue strengthening this compelling evidence through discovery and expert testimony.[6]

---

[6] Frontier cites only *Attorney General of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769 (10th Cir. 2009), to justify dismissal on causation, but the *Tyson Foods* decision came on a motion for a preliminary injunction, not a Rule 12(c) motion. The district court there had "conduct[ed] eight days of evidentiary hearings, receiv[ed] testimony from numerous witnesses, and review[ed] hundreds of exhibits" before concluding that "Oklahoma had failed to meet the heightened standard (as modified by RCRA) required for a mandatory injunction . . . ." *Id.* at 775. That decision plainly has no bearing here, where the Court must confine its review to the pleadings, accept the factual content in the Complaint as true, and deny dismissal so long as Plaintiffs make

**B. RCRA applies retroactively to past actions, so long as those actions created a present threat to the environment.**

Frontier next argues that the plastic pellets still polluting the environment do not present an "imminent" endangerment because Frontier has implemented new containment and housekeeping measures to prevent further pellet spills. Dkt.#23-1 at 26.[7] While Plaintiffs dispute the adequacy of those measures, *see infra* at 27, Frontier's argument suffers from a more fundamental flaw—it incorrectly grafts the standard for an ongoing violation under the CWA onto RCRA. Citing *Gwaltney*, 484 U.S. 49, a decision construing the CWA citizen suit provision, Frontier advances a novel theory that Plaintiffs can only maintain a RCRA claim if Frontier will continue to spill pellets in the future. Dkt.#23-1 at 25-26. However, the endangerment provision is concerned with "the nature of the threat rather than identification of the time when the endangerment initially arose. The [provision], therefore, may be used for events which took place *at some time in the past* but which *continue to present a threat* to the public health or the environment." *Cox*, 256 F.3d at 300 (emphasis added) (citation omitted); *see also Parker*, 386 F.3d at 1014 ("[Section 6972(a)(1)(B)] applies retroactively to past violations, so long as those violations are a present threat to health or the environment." (citing *Meghrig*, 516 U.S. at 485-86)).

---

a plausible claim for relief. *Iqbal*, 556 U.S. at 687. Further, unlike in *Tyson Foods*, Frontier has offered none of its own evidence—other than vague references of "up to twenty other entities that handle or distribute production pellets in the Charleston area," Dkt.#23-1 at 25—to rebut Plaintiffs' considerable causal evidence. *See Tyson Foods*, 565 F.3d at 774 (defendants presented evidence that their storage and application techniques for poultry litter killed the bacteria responsible for contaminating a watershed).

[7] Frontier also repeats—for the third time—its argument that Plaintiffs have not sufficiently alleged a causal link between Frontier and the pellets polluting area waters and beaches. Plaintiffs have already responded to this argument twice, *see supra* at 9-12, 15, and will not do so again, except to reiterate that the Complaint, and the factual allegations within it, plainly meets the pleading standard on this issue.

Frontier's allegations that it is now following "best management practices" and participating in Operation Clean Sweep, do not resolve whether "there is a present and ongoing risk of harm" under RCRA. Dkt.#23-1 at 26. Instead, past pellet spills continue to present an "imminent" endangerment to the environment so long as those pellets remain in waters and on land, posing an exposure risk to wildlife and aquatic resources. *See Goldfarb v. Mayor of Baltimore*, 791 F.3d 500 (4th Cir. 2015) (finding plaintiffs sufficiently pleaded a claim against a previous site owner whose contamination was migrating to adjacent property and a river); *Black Warrior River-Keeper, Inc. v. Drummond Co., Inc.*, 387 F. Supp. 3d 1271 (N.D. Ala. 2019) (finding remnant waste at a dormant mine could present an imminent endangerment to the environment). Whereas Frontier applauds itself for joining a week-long beach cleanup on Sullivan's Island last July, Dkt.#23-1 at 3, 26, the Waterkeeper has since continued to find alarming quantities of plastic pellets in and around Charleston Harbor, including on Sullivan's Island, Dkt.#1, ¶¶ 52, 58. Because the Waterkeeper has sampled only in locations accessible by land and only for 10 minutes at a time, Dkt.#1 ¶¶ 50-51, 58, its sampling results are likely just the tip of the pollution iceberg. The endangerment from Frontier's pellet spills is thus imminent.[8]

**C. An endangerment is "substantial" where, as here, solid waste threatens lethal and sub-lethal injury in wildlife.**

Frontier lastly argues that Plaintiffs have failed to plead a "substantial" endangerment absent details about "the amount of pellets in Charleston's water, the number of animals that may be impacted, or the amount that must be ingested in order to cause an imminent and substantial endangerment." Dkt.#23-1 at 28. Here again, Frontier completely ignores the relevant standard for an endangerment claim, particularly at the pleading stage. "[T]here is no requirement in

[8] To abate the endangerment and avoid an endangerment claim, Frontier would have needed to remove the spilled pellets from the environment, but as evidenced by the Waterkeeper's sampling data, the company never did so. *Cf. Meghrig*, 516 U.S. at 480.

RCRA for a plaintiff to make 'a particular quantitative showing as a *sine qua non* for liability.'" *Liebhart v. SPX Corp.*, 917 F.3d 952, 959 (7th Cir. 2019) (quoting *Interfaith*, 399 F.3d at 260); *see also Burlington N.*, 505 F.3d at 1021. Nor is there any requirement that a plaintiff show *actual* harm, only *threatened or potential* harm. *See Simsbury-Avon*, 575 F.3d at 211. Instead, courts deem an endangerment substantial when it is "serious"—more specifically, when "there is reasonable cause for concern that someone or something may be exposed to risk of harm" absent remedial action. *Burlington N.*, 505 F.3d at 1021. Plaintiffs pleaded such a "reasonable cause for concern" in the Complaint.

Plastic pellet exposure has been shown to produce "a variety of lethal and sub-lethal effects in animals," including those present in the Charleston area. Dkt.#1, ¶ 59. For example, when ingested by seabirds, marine turtles, fish, and other wildlife, plastic pellets can cause starvation and lacerations and potentially lead to death. *Id.* at ¶ 61-62. Pellets also contain a "cocktail of contaminants," including chemicals listed by the U.S. Environmental Protection Agency ("EPA") as priority pollutants, which can lead to "changes in gene expression, inflammation, disruption of feeding behavior, decreases in growth, decreases in reproductive success, changes in larval development, reduced filtration and respiration rates, and decreased survival" via ingestion and leachate. *Id.* at ¶ 64-67. As a coastal estuary, Charleston Harbor, and other connected waterbodies, provides habitat for many of the species harmed by plastic pellet pollution. Dkt.#1, ¶ 68-69. These categories of potential harms are line with what other courts have deemed "substantial" under RCRA. *See, e.g.*, *Dague v. City of Burlington*, 935 F.2d 1343, 1356 (2d Cir. 1991), *reversed on other grounds*, 505 U.S. 557 (1992) (landfill leachate that contained chemicals on the EPA toxic list was a substantial endangerment to aquatic life).

Faced with these allegations of substantial endangerment, Frontier claims that Plaintiffs "failed to allege that any relief is necessary to prevent these harms" based on case law where defendants avoided RCRA liability through prior or ongoing remediation work. Dkt.#23-1 at 28-29. But these remediation cases are not on point given that Frontier has not performed, or even alleged, *any* efforts to remediate the pellet pollution remaining in the environment. *Id.*[9] Even if Frontier had performed any remediation directed at the present endangerment, those efforts would not foreclose a RCRA claim. "Simply because remediation is currently occurring does not eliminate the question of whether the extent of remediation is appropriate in order to abate a possibly imminent and substantial endangerment." *Tilot Oil*, 907 F. Supp. 2d at 964; *see also Liebhart*, 917 F.3d at 963. "[T]he enforcement language of § 6972(a)(1)(B) is generous: it says that a district court may, *inter alia*, 'order . . . such other action as may be necessary' to remedy a violation of the statute." *Interfaith*, 399 F.3d at 268. Contrary to Frontier's claims, Dkt.#23-1 at 29, the Supreme Court has held that "a citizen plaintiff could seek a mandatory injunction that orders a responsible party to 'take action' by attending to the *cleanup* and *proper disposal* of waste . . . ." *Meghrig*, 516 U.S. at 479 (emphasis added). And courts have routinely exercised this broad equitable jurisdiction to require liable defendants to do just that. *See, e.g.*, *Interfaith*, 399 F.3d at 264; *Nashua Corp. v. Norton Co.*, 116 F. Supp. 2d 330, 359 (N.D.N.Y. 2000).

---

[9] Frontier's alleged new "best management practices" are not relevant since they were designed only to address future pellet spills, not ongoing endangerment from past spills. The company's own hand-picked cases confirm this nuance. *See Miller v. City of Fort Myers*, 424 F. Supp. 3d 1136 (M.D. Fla. 2020) (finding no endangerment where City excavated and removed 30,000 tons of lime sludge); *Tilot Oil, LLC v. BP Products N. Am., Inc.*, 907 F. Supp. 2d 955 (E.D. Wis. 2012) (finding no endangerment where defendant installed groundwater monitoring wells, conducted enhanced fluid recovery, and installed a building ventilation system following petroleum spills); *Liebhart v*, 917 F.3d 952 ( finding no endangerment where plaintiffs failed to identify deficiencies in the state-approved cleanup plan for PCB contamination).

It is premature to begin debating what remedial measures may be necessary to abate the endangerment that plastic pellets present to the environment. What is clear, however, is that Plaintiffs have adequately pleaded a RCRA endangerment claim against Frontier, through allegations that: (1) Frontier is the source of the plastic pellets that continue to pollute Charleston-area waters and beaches; (2) those pellets may present an "imminent" endangerment to the environment so long as Frontier has not cleaned them up or performed other necessary remediation; and (3) those pellets may present a "substantial" endangerment to wildlife and aquatic resources via ingestion or other exposure. Finally, in light of RCRA's broad remedial purpose, if the Court does ultimately find Frontier liable, it could "grant all relief necessary to ensure complete protection of the public health and the environment." *Little Hocking*, 91 F. Supp. 3d at 952 (internal quotations and citation omitted).

## III. <u>**Frontier's Plastic Pellet Spills Are "Solid Waste" Under RCRA.**</u>

In its next attempt to evade liability, Frontier argues that Plaintiffs' RCRA claims are barred because the plastic pellets spilled from its Union Pier facility are not "discarded material"—and, therefore, not "solid waste"—under RCRA. Dkt.#23-1 at 21-22. This argument hinges on Frontier's assertion that pellets cannot be "discarded material" until they serve their "intended use and purpose" and are no longer wanted by the consumer. *Id.* at 21. Contrary to Frontier's assertions, such a restrictive definition of "discarded material" is not borne out in the case law. Instead, courts broadly interpret the term to include any industrial or commercial product, at any stage of the supply chain, that loses its "beneficial purpose" through abandonment in the environment. *See, e.g.*, *Cmty. Ass'n for Restoration of the Env't, Inc. v. Cow Palace, LLC*, 80 F. Supp. 3d 1180, 1223 (E.D. Wash. 2015); *Waldschmidt v. Amoco Oil Co.*, 924 F. Supp. 88, 90 (C.D. Ill. 1996); *Zands v. Nelson*, 779 F. Supp. 1254, 1262 (S.D. Cal. 1991), *modified*, 797 F. Supp. 805 (S.D. Cal. 1992). Because the plastic pellets spilled (and abandoned)

by Frontier into the Cooper River and onto nearby property have lost their beneficial purpose, they fit squarely within this definition of "discarded material" and are thus "solid waste" for purposes of an endangerment claim.

Under RCRA, "solid waste" is defined, in relevant part, as "discarded material, including solid, liquid, semisolid or contained gaseous material resulting from industrial [and] commercial . . . operations . . . ." 42 U.S.C. § 6903(27). RCRA does not further define "discarded material," so courts have given the term its "plain meaning"—"to cast aside; reject; abandon; give up." *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 515 (9th Cir. 2013) (internal quotations and citation omitted);[10] *see also Del. Riverkeeper Network v. Soil Safe, Inc.*, 223 F. Supp. 3d 231, 236 (D.N.J. 2016). "As broad as this definition may be, clearly it would not include materials that still are useful products"; therefore, a product must have lost its *beneficial purpose* to count as a "discarded material." *Zands*, 779 F. Supp. at 1262. This can occur, for example: (1) where, as Frontier notes, a product has served its beneficial purpose and is no longer wanted by the consumer, *see Ecological Rights*, 713 F.3d at 515, or (2) where, as here, a product loses its beneficial purpose *before* it can be used by the consumer for said purpose, *see Craig Lyle Ltd. Patnership v. Land O'Lakes, Inc.*, 877 F. Supp. 476, 482 (D. Minn. 1995). Courts have also identified other relevant considerations bearing on whether a product is "discarded" under RCRA, in particular:

> (1) whether the material is 'destined for *beneficial reuse or recycling* in a continuous process by the generating industry itself;' (2) whether the materials are being *actively reused*, or whether they merely have the potential of being reused; (3) whether the materials are *reused by its original owner*, as opposed to use by a salvager or reclaimer."

---

[10] Curiously, although Frontier's motion repeatedly cites the *Ecological Rights* decision, it does not mention, much less grapple with, the opinion's broad definition of "discarded material" and its applicability to the plastic pellets at issue here.

*Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1043 (9th Cir. 2004) (emphasis added) (internal quotations and citation omitted).[11]

*Cow Palace* is instructive because it considered whether "otherwise beneficial manure stored in [the defendant's] several lagoons is transformed into 'solid waste' under RCRA when it leaks into the soil and accumulates in the environment, losing all beneficial fertilization and commodity purposes." 80 F. Supp. 3d at 1223. The court found that, because the leaked manure could no longer serve its beneficial purpose, the defendant had "discarded" it within the endangerment provision:

> Here, the manure leaking from Defendants' lagoons is . . . a consequence of the poorly designed temporary storage features of the lagoons. The consequence of such permeable storage techniques, thus, converts what would otherwise be a beneficial product (the stored manure) into a solid waste (the discarded, leaching constituents of manure) under RCRA because the manure is knowingly abandoned to the underlying soil. *Ecological Rights*, 713 F.3d at 515 (noting the plain meaning of "discarded" includes "abandon").

*Cow Palace*, 80 F. Supp. 3d at 1223.[12] This holding is consistent with other judicial decisions in which formerly useful products were found to have been converted into

---

[11] Some courts have also turned to related statutory and regulatory provisions within RCRA for guidance on the meaning of "discarded material." *See, e.g.*, *Dydio v. Hesston Corp.*, 887 F. Supp. 1037, 1047 (N.D. Ill. 1995); *Zands*, 779 F. Supp. at 1261-62. For example, 40 C.F.R. § 261.2(a)-(b), which governs RCRA's permitting programs, defines "discarded material" as any material that is "abandoned" by being "[d]isposed of," and RCRA defines "disposal" as "the discharge . . . spilling, leaking, or placing of any solid waste . . . into or on any land or water," 42 U.S.C. § 6903(3).[11] Although this regulatory definition does not carry over to the endangerment provision, it is relevant insofar as "the statutory definition of 'solid waste' [at issue here] is *broader* than the regulatory definition." *Owen Elec. Steel Co. of S.C., Inc. v. Browner*, 37 F.3d 146, 148 n.3 (4th Cir. 1994) (emphasis added); *see also Simsbury-Avon*, 575 F.3d at 206; *Benjamin v. Douglas Ridge Rifle Club*, 673 F. Supp. 2d 1210, 1221 (D. Or. 2009). Though not required, the plastic pellets released by Frontier would satisfy even the stricter regulatory definition of "discarded material" because Frontier has abandoned them by discharging, spilling, leaking, or placing them into or on land or water. *See* 40 C.F.R. § 261(a)-(b); 42 U.S.C. § 6903(3).

[12] The *Cow Palace* decision, from a district court in the Ninth Circuit, thoroughly analyzed Frontier's preferred *Ecological Rights* decision and found that it did not exclude this leaking manure from the definition of "discarded material" because the leakage was "not a natural,

"discarded material" by their release into the environment. *See, e.g.*, *Agric. Excess & Surplus Ins. Co. v. A.B.D. Tank & Pump Co.*, 878 F. Supp. 1091, 1095 (N.D. Ill. 1995); *Dydio*, 887 F. Supp. at 1047-48. *Zands*, for example, held that gasoline leaking from an underground storage tank is "discarded" under RCRA because "the gasoline is no longer a useful product after it leaks into, and contaminates, the soil. At this point, the gasoline cannot be re-used or recycled," and has "been abandoned via the leakage (even if unintentional) into the soil." 779 F. Supp. at 1262. Concurring with *Zands*, the court in *Land O'Lakes* added that "leaked or spilt petroleum *cannot be used for its intended purpose*." 877 F. Supp. at 482 (emphasis added). This line of case law does not turn on whether the person discarding the product is an end user or an intermediary, or whether the product was discarded with intent. *See Del. Riverkeeper*, 223 F. Supp. 3d at 238.[13]

Applying those principles here, the plastic pellets that spill from Frontier's Union Pier facility into the Cooper River and onto nearby property are "discarded material" and thus "solid waste." Like the manure in *Cow Palace* and the gasoline in *Zands*, the plastic pellets have lost their beneficial purpose through abandonment in the environment, and the pellets reach the environment as "a consequence of the poorly designed [containment and housekeeping] features" at the Union Pier facility. *Cow Palace*, 80 F. Supp. 3d at 1223; *see* Dkt.#1, Complaint ¶ 48; Dkt.#1-1 at 55-59. Once a pellet escapes containment at the facility, "what would otherwise be a beneficial product" has been contaminated,

---

expected consequence of the manure's use or intended use," contrary to the wood preservative in *Ecological Rights*. *Cow Palace*, 80 F. Supp. 3d at 1223.

[13] When gasoline accidentally leaks from a retailer's storage tank, it cannot make it to the end customer to serve its intended use as fuel for vehicles and equipment. *See, e.g.*, *A.B.D. Tank*, 878 F. Supp. at 1092; *Zands*, 779 F. Supp. at 1257. Similarly, the dairy in *Cow Palace* could not sell its manure to end customers as compost when it accidentally leaked from earthen impoundments. 80 F. Supp. 3d at 1187.

*Cow Palace*, 80 F. Supp. 3d at 1223, and Frontier cannot "reuse[] or recycle[]" it for manufacturing plastic goods, *Zands*, 779 F. Supp. at 1262. Indeed, Frontier did not repackage the plastic pellets recovered from Sullivan's Island in July 2019 for their intended purpose, nor has it apparently ever attempted to recover and repackage the innumerable pellets still polluting Charleston-area waterways, beaches, and other property. Dkt.#23-1 at 2-3; *see also Safe Air*, 373 F.3d at 1043. Rather, Frontier has "discarded" these now useless pellets as "solid waste" under RCRA.

There is therefore no merit to Frontier's argument that plastic pellets cannot be "solid waste" unless and until they have served their intended purpose and are no longer wanted by the consumer. After all, the only reason that these pellets "cannot be used for [their] intended purpose" is because Frontier, through its own fault, spilled them into the environment. *Land O'Lakes*, 877 F. Supp. at 482. By contrast, the cases cited in Frontier's motion all addressed distinct factual scenarios, not applicable here, in which products were "released into the environment as a *natural, expected consequence* of [their] intended use. *Ecological Rights*, 713 F.3d at 518 (emphasis added). For example, in *No Spray Coalition, Inc. v. City of New York*, the court found that pesticides are not "solid waste" when sprayed into the air to "*effect[uate] their intended purpose*: reaching and killing mosquitoes and their larvae." 252 F.3d 148, 150 (2d Cir. 2001) (emphasis added). The same applies to salt that is used to de-ice roads, *Krause v. City of Omaha*, No. 8:15CV197, 2015 WL 5008657, at *4 (D. Neb. Aug. 19, 2015), and PCP-based wood preservative that is used to treat utility poles, *Ecological Rights*, 713 F.3d at 518.[14] Plastic

[14] Even the *Ecological Rights* decision on which Frontier so heavily relies was expressly narrowed to only the facts before the court. As the court emphasized:

pellets, however, are not released into the environment to effectuate their intended use as manufacturing components in plastic goods, and Frontier cannot argue otherwise. *See Cow Palace*, 80 F. Supp. 3d at 1223 ("[T]he manure leaking from Defendants' lagoons is not a natural, expected consequence of the manure's use or intended use . . . .").

In sum, Frontier tries to oversimplify RCRA by arguing that plastic pellets must be used by an end consumer for their ultimate purpose before they can become "discarded material." But the law is far more expansive than that. Courts agree that a material is "discarded" when it loses its beneficial purpose upon release into the environment, though not when its release into the environment is necessary and expected to carry out its beneficial purpose. *See Del. Riverkeeper*, 223 F. Supp. 3d at 238. Frontier's motion ignores the first line of case law and focuses exclusively on the second, yet cases involving pesticides, road salt, and wood preservative are inapposite since plastic pellets are not released into water or onto land to serve their intended purpose in manufacturing plastic goods. Instead, these pellets lost the ability to serve their beneficial purpose when Frontier spilled, and then abandoned, them in the environment; therefore, they plainly qualify as "discarded material" (and "solid waste") under RCRA.

---

> [W]e do not decide whether or under what circumstances PCP, wood preservative, or another material becomes a RCRA "solid waste" when it accumulates in the environment as a natural, expected consequence of the material's intended use.

*Ecological Rights*, 713 F.3d at 518. Indeed, as this excerpt acknowledges, there are circumstances in which materials can be "discarded" even when they were originally released into the environment to effectuate their intended purpose. *See, e.g.*, *Cow Palace*, 80 F. Supp. 3d at 1221 (holding manure is "discarded" when over-applied as fertilizer to agricultural fields); *Conn. Coastal Fishermen's Ass'n v. Remington Arms Co., Inc.*, 989 F.2d 1305, 1316 (2d Cir.1993) (holding lead bullets and clay target debris are "solid waste" when abandoned for nearly 70 years at a firing range).

## IV. **The Complaint Sufficiently Alleges That Frontier's CWA Violations Are Ongoing.**

As with their RCRA claims, Plaintiffs have made the requisite good faith allegations that Frontier's CWA violations are ongoing. The Supreme Court in *Gwaltney* determined that an ongoing violation occurs when there is "a reasonable likelihood that a past polluter will continue to pollute in the future." 484 U.S. at 65. A plaintiff can establish such an ongoing violation by "proving violations that continue on or after the date the complaint is filed" or by adducing evidence that there is "a continuing likelihood of a recurrence in intermittent or sporadic violations." *Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd.*, 844 F.2d 170, 171 (4th Cir. 1988). "Intermittent or sporadic violations do not cease to be ongoing until the date when there is no real likelihood of repetition." *Id.* Plaintiffs must only put forth "good faith" allegations of an ongoing violation at this stage. *Gwaltney*, 484 U.S. at 65; *see also Idaho Conservation League v. Poe*, 421 F. Supp. 3d 983, 992 (D. Idaho 2019). "If the defendant wishes to argue that the allegations are untrue . . . the defendant must move for summary judgment and demonstrate that 'the allegations were sham and raised no genuine issue of fact.'" *Sierra Club v. Union Oil Co. of Cal.*, 853 F.2d 667, 669 (9th Cir. 1998) (quoting *Gwaltney*, 484 U.S. at 66); *see also PennEnvironment v. PPG Industries, Inc.*, 964 F. Supp. 2d 429, 470 (W.D. Pa. 2013).

Plaintiffs easily meet the standard to allege an ongoing violation. As noted above, the Complaint provided evidence of ongoing plastic pellet discharges from eight months of sampling data, most of which came *after* Plaintiffs sent their 60-day notice in October 2019. *See supra* at 10-11.[15] Further, the pellets recovered from the environment are similar in appearance and

[15] The fact that plastic pellets remain in Charleston waters, by itself, is enough to allege an ongoing violation. Dkt.#1, ¶ 86 ("[E]ach and every day plastic pellets remain in waters is a separate and distinct violation of Section 301(a) of the CWA."); *see also PennEnvironment*, 964 F. Supp. 2d at 471 (denying dismissal based on allegations that "unlawful pre-complaint discharges that affect the sediments continue or are ongoing until the sediments are remediated"). Courts have found in some circumstances that CWA violations are ongoing against the polluter

chemical composition to those handled by Frontier. *See supra* at 11. The fact that Frontier may have implemented some containment and housekeeping measures at the Union Pier facility is of little moment given these sampling and testing results, as well as Plaintiffs' allegations that the new measures are insufficient to prevent future spills. Dkt.#1, ¶ 87; *see, e.g.*, *San Francisco Herring Ass'n v. Pac. Gas & Elec. Co.*, 81 F. Supp. 3d 847, 861 (N.D. Cal. 2015) (denying dismissal where, "despite remediation, a high level of contamination still exists and is affecting the Bay"); *St. Johns Riverkeeper, Inc. v. Jacksonville Elec. Authority*, No. 3:07-cv-739-J-34TEM, 2010 WL 745494, at *6-7 (M.D. Fla. Mar. 1, 2010) (finding a genuine issue of fact as to whether "significant steps to *reduce* [violations]" were "a fix beyond reasonable probability"). At this stage in the litigation, before discovery, the Court cannot conclude, with *absolute clarity*, that there is no likelihood of ongoing violations. *See PennEnvironment*, 964 F. Supp. 2d at 470 ("[W]hether intermittent or sporadic violations are ongoing or wholly past requires evidence, including evidence as to whether the risk of defendant's continued violation had been completely eradicated when citizen-plaintiffs filed suit." (internal quotations and citation omitted)).[16] As such, Plaintiffs' claim under the CWA remains valid, and the Court must deny Frontier's motion.

---

so long as the pollutants discharged without a permit, or in violation of a permit, remain in the waterway. *See, e.g.*, *Sasser v. EPA*, 990 F.2d 127, 128-29 (4th Cir. 1993) ("Each day the pollutant remains in the wetlands without a permit constitutes an additional day of violation."); *Ohio Valley Envtl. Coal., Inc. v. Hernsham Partners, LLC*, 984 F. Supp. 2d 589 (S.D. W. Va. 2013) (permitting an ongoing violation claim based on the migration of selenium through a tributary, "even if the activities that caused the violations have ceased"). There thus remains a genuine issue of fact as to whether the plastic pellets discharged by Frontier without a permit present such a circumstance, especially since they "do not significantly dissipate or dissolve over time." *City of Mountain Park v. Lakeside at Ansley, LLC*, 560 F. Supp. 2d 1288, 1296 (N.D. Ga. 2018).

[16] Plaintiffs intend to conduct discovery on a range of matters relevant to whether there is an ongoing violation under the CWA—for example, the mechanisms of discharge at the Union Pier facility; the containment and housekeeping measures allegedly implemented at the facility following the July 2019 spill; company records regarding compliance with, and the performance of, those measures; and depositions of Frontier employees regarding operations at the facility.

## V. Plaintiffs' RCRA Claim and CWA Claim Are Both Viable.

Frontier finally argues that Plaintiffs must elect a cause of action under RCRA or the CWA, but not both, since RCRA excludes "industrial discharges which are point sources subject to [NPDES] permits under [CWA Section 402]." Dkt.#23-1 at 33-34 (quoting 42 U.S.C. § 6903(27). This argument rises and falls on one fatal assumption—that either all plastic pellet "pathways" at the Union Pier facility are point source discharges subject to a NPDES permit, or none are. But what Frontier ignores is that Plaintiffs have alleged several distinct pathways by which pellets convey from the facility into the environment. For example, wind, stormwater, and washwater may transport pellets, Dkt.#1 ¶¶ 37-40, through drainage outlets and exposed seams and over the wharf edge, Dkt.#1 ¶ 33. These various pathways are not only factually distinct, but also *legally* distinct: Some may be "point source discharges" subject to the CWA, whereas others may be "solid waste" subject to RCRA. *See, e.g.*, *Black Warrior River-Keeper*, 387 F. Supp. 3d at 1305-06 (plaintiff maintained CWA claims and a RCRA claim against separate violations at an abandoned mine). Critically, Plaintiffs must have an opportunity to conduct discovery to confirm precisely which pathways are regulated under which statute. It would thus be premature to force Plaintiffs to pick one claim and give up the other. *See* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.").

As a starting point, the Complaint properly alleges violations of both RCRA and the CWA based on different pathways of pellet pollution escaping from the Facility. The Court cannot dismiss Plaintiffs' RCRA claim now—or at any point in the future—based on the "solid waste" exclusion for CWA-regulated discharges. The Complaint alleges that Frontier spills plastic pellets not only into the Cooper River, but also onto nearby *land*. Dkt.#1 ¶¶ 37-40, 76. Specifically, Plaintiffs' sampling protocol has uncovered pellets along the fence line outside the Union Pier facility, which, upon information and belief, were transported there directly from the

facility by wind or stormwater, Dkt.#1 ¶ 54, and which independently present an imminent and substantial endangerment to the environment, Dkt.#1, ¶¶ 76-78. Because these pellets were never discharged into the Cooper River or any other waters, they are not regulated under the CWA and are thus not excluded from "solid waste" under RCRA. *See* 33 U.S.C. § 1311(a).[17] Plaintiffs have also pleaded sufficient facts to establish a cause of action under the CWA—separate from, but concurrent with, their cause of action under RCRA. The Complaint alleges that wind, washwater, and other forces transport loose pellets through point sources at the facility and into the Cooper River, resulting in unpermitted, ongoing discharges in violation of the CWA. Dkt.#1, ¶¶ 37-40, 84.

Without the benefit of discovery, Plaintiffs cannot specify for certain which pellet pathways at the Union Pier facility are subject to the CWA and which are subject to RCRA. This case is complicated by the fact that there is no easily discernable "end-of-the-pipe" discharge at the Union Pier facility. Rather, Plaintiffs allege that Frontier spills pellets into the Cooper River through several conveyances, and discovery is needed to ascertain which of these are point sources and which are not. For example, the Complaint alleges that pellets are transported directly off the wharf and into the Cooper River. *See* Dkt.#1 ¶ 33, 37-40; Dkt.#1-1 at 190, 200, but Plaintiffs do not yet have sufficient information about the design of the facility to determine whether the wharf *itself* is a point source, *compare Puget Soundkeeper All. v. Cruise Terminals of Am., LLC*, 216 F. Supp. 3d 1198, 1210 (W.D. Wash. 2015), *with*, *Puget Soundkeeper All. v.*

[17] Further, Frontier admits in its Answer that it has not obtained a NPDES permit for operations at the Union Pier facility, and avers that "it is in full compliance with all applicable laws." Dkt.#12, ¶ 84; *see also* 40 C.F.R. § 122.21(b) ("When a facility or activity is owned by one person but is operated by another person, it is the operator's duty to obtain a permit."). If valid—and Plaintiffs do not concede this point—then it is possible that even some of Frontier's pellet discharges into the Cooper River are not subject to CWA regulation, in which case RCRA would provide the appropriate cause of action.

*Louis Dreyfus Commodities LLC*, 192 F. Supp. 3d. 1165, 1178-79 (W.D. Wash. 2016).[18] The same factual uncertainty extends to other conveyances at the facility, such as the gap underneath the truck loading dock. Dkt.#1-1 at 202-07. Through discovery, Plaintiffs intend to seek facility diagrams and photographs and other information to clarify which conveyances are point sources subject to a CWA claim and which are subject to a RCRA claim.[19]

This case is further complicated by the fact that there are several different means of transport for pellets at the Union Pier facility, including, but not limited to, wind, stormwater, and washwater. Dkt.#1 ¶ 37-40. Even some point source discharges at the facility may *not* be subject to CWA regulation depending on the means of transport, and thus would not be subject to the "solid waste" exclusion under RCRA. Specifically, the CWA and implementing regulations exempt most point source *stormwater* discharges from NPDES permit requirements. *See* 33 U.S.C. § 1342(p); 40 C.F.R. § 122.26(b)(14); *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 603-04 (2013). Only industrial facilities that fall into an EPA-designated Standard Industrial Classification ("SIC") code must obtain a NPDES permit for their stormwater discharges. 40 C.F.R. § 122.26(b)(14); *see Decker*, 568 U.S. at 611-13. Based on this regulatory regime, there remain factual questions as to whether Frontier's operations are classified under an EPA-designated SIC code, and, therefore, whether Frontier's stormwater discharges are subject to a

[18] The court in *Cruise Terminals* held that a cruise terminal was not a point source where the plaintiff "ha[d] failed to identify any manner in which the cruise terminal itself, separate from its stormwater drainage system, operates as a 'confined, discrete conveyance.'" 216 F. Supp. 3d at 1210 (citation omitted). By contrast, in denying summary judgment on a similar argument, the court in *Louis Dreyfus* emphasized that a shipping pier was "graded in a manner that conveys stormwater through the bull rail and into Elliott Bay," and thus acted as a point source. 192 F. Supp. 3d at 1179. Thus, depending on the design and specifications of the Union Pier facility, the wharf itself, separate from its stormwater drainage system, may or may not be a point source.

[19] Other than photographs, the closest Plaintiffs have to a detailed diagram of the Union Pier facility is a hand-drawn map, Dkt.#1-1 at 177, and Google Earth imagery, Dkt.#1-1 at 176.

NPDES permit. If not, then its stormwater discharges would be subject to a RCRA claim rather than a CWA claim. *See Ecological Rights*, 874 F.3d at 1097-99. Discovery is again needed to discern the full nature and breadth of operations at the Union Pier facility before Plaintiffs, or the Court, can answer these questions.

Plaintiffs will ultimately have to determine which pathways at the Union Pier facility are subject to a CWA claim and which are subject to a RCRA claim. For some pathways, Plaintiffs may decide to pursue only a CWA claim or a RCRA claim, whereas for others, it may be more appropriate to pursue both claims in the alternative. But that determination is predicated on factual questions that can only be resolved through discovery. At this stage, Plaintiffs have sufficiently pleaded claims under RCRA and the CWA, and it would be error to require Plaintiffs to pick just one claim and entirely forego the other. *See Day v. DB Capital Grp., LLC*, No. 10–CV–1658, 2011 WL 887554, at *16 (D. Md. Mar. 11, 2011) ("While ultimately plaintiff may be unable to recover under both his unjust enrichment and breach of contract claims, he may continue to pursue them both at this time [i.e., the Rule 12(b)(6) stage].").

## CONCLUSION

For all of the reasons stated herein, Defendant's Motion for Judgment on the Pleadings should be denied.

Dated: August 14, 2020

Respectfully submitted,

*s/ Catherine M. Wannamaker*
Bar No. 12577
cwannamaker@selcsc.org
Southern Environmental Law Center
525 East Bay Street, Suite 200
Charleston, SC 29403
Telephone: (843) 720-5270
Facsimile: (843) 414-7039

*Attorney for Plaintiffs Charleston Waterkeeper and South Carolina Coastal Conservation League*