**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| CHARLESTON WATERKEEPER and SOUTH CAROLINA COASTAL CONSERVATION LEAGUE, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 2:20-cv-1089-DCN |
| vs. | ) ) | **ORDER** |
| FRONTIER LOGISTICS, L.P., | ) ) | |
| Defendant. | ) ) ) | |

The following matter is before the court on defendant Frontier Logistics, L.P.'s ("Frontier") motion for judgment on the pleadings, ECF No. 23, and motion to strike, ECF No. 31, and on third party South Carolina State Ports Authority's (the "Ports Authority") motion to quash, ECF No. 29. For the reasons set forth below, the court denies the motions.

## I.   BACKGROUND

This is an action filed pursuant to the citizen-suit provisions of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., and the Clean Water Act ("CWA"), 33 U.S.C. § 1251 et seq. In the summer of 2019, residents of Sullivan's Island and Isle of Palms, South Carolina began discovering BB-sized plastic pellets washing up along the shoreline of their beaches. On July 19, 2019, the South Carolina Department of Health and Environmental Control ("SCDHEC") received a report from a citizen of Sullivan's Island that he encountered pellets along the intercoastal waterway "in the [thousands]." ECF No. 1-1 at 213.

1

Frontier is a supply chain management service that packages small plastic production pellets, also called "nurdles", into 25-kilogram bags, "stretch-hood[s] or stretch-wrap[s]" the plastic pellets onto pallets, and sells the pallets to manufacturers of plastic goods. ECF No. 23 at 1. Frontier operates out of a facility located at the Union Pier Terminal in downtown Charleston, South Carolina, overlooking the Charleston harbor. On the same day that DHEC received the report of escaped plastic pellets, DHEC notified Frontier "that DHEC was attributing the spill to Frontier and that it should immediately begin the cleanup process." Id. at 2. Frontier denied that any pellets originated from its facility but nevertheless implemented increased safety measures to prevent the spill of plastic materials and assisted in the clean-up effort on Sullivan's Island. After the spill, DHEC conducted two site visits of Frontier's Union Pier facility, after which DHEC officially alleged, by way of a July 26, 2019 letter, that Frontier violated the South Carolina Pollution Control Act. ECF No. 1-1 at 210. On August 29, 2019, Frontier responded to the allegation by letter, denying responsibility for the spilled pellets, explaining the extent of the procedures it employs to guard against spills, and notifying DHEC of its participation in the effort to clean up the affected beaches. ECF No 1-1 at 240–243. On August 1, 2019, DHEC held an enforcement conference to discuss Frontier's alleged violation.

On October 17, 2019, DHEC sent another letter to Frontier, notifying Frontier that DHEC was closing the investigation into the July 2019 spill without further action. The letter explained: "During the enforcement conference, Frontier asserted that some of the plastic pellets [DHEC] personnel observed on Sullivan's Island Beach and Isle of Palms Beach were similar to those handled by Frontier; however, other pellets observed by

[DHEC] personnel were not the type handled by Frontier." Id. at 244. The letter also summarized Frontier's practices and procedures designed to prevent spills and noted Frontier's participation in the clean-up effort. Ultimately, based upon its "investigation and the supplemental information provided by Frontier," DHEC "determined that the [ ] matter should be closed" without further state action. Id. at 245.

Plaintiffs are both "Charleston-based § 501(c)(3) not-for-profit organization[s]," each organized for an environmental purpose related to preserving and protecting South Carolina's coastland, waterways, and their resources. ECF No. 1, Compl. ¶¶ 11–12. According to the complaint, in September 2019, plaintiffs began to collect and sample spilled plastic pellets at various locations within the Charleston Harbor Watershed as part of "an exhaustive effort" to determine the source of the spilled pellets. ECF No. 26 at 1. In their complaint, plaintiffs allege that they consistently recorded the highest concentration of pellets at the collection sites closest to Frontier's Union Pier facility. Compl. at ¶ 53. Plaintiffs also assert that the plastic pellets recovered "resemble those found" at Frontier's facility," id. at ¶ 55, and that chemical testing reveals that the collected pellets are comprised of the same material as those handled by Frontier, id. at ¶ 56. Further, the complaint alleges that plaintiffs continue to find spilled pellets throughout the Charleston Harbor Watershed. Id. at ¶ 58.

Plaintiffs filed this action on March 18, 2020, asserting two claims under the RCRA and the CWA, respectively, and requesting injunctive relief, the imposition of civil penalties, and an award of litigation costs and attorney's fees. ECF No. 1. On July 20, 2020, Frontier filed a motion for judgment on the pleadings. ECF No. 23. Plaintiffs responded to the motion on August 14, 2020, ECF No. 26, and Frontier replied on August

3

21, 2020, ECF No. 30.  Accompanying its reply, Frontier also filed a motion to strike on August 21, 2020, ECF No. 31.  On August 25, 2020, plaintiff filed a response, ECF No. 33, and on September 3, 2020, Frontier filed a reply, ECF No. 36.  Additionally, the Ports Authority filed a third-party motion to quash plaintiffs' subpoena on August 19, 2020. ECF No. 29.  Plaintiffs responded to the motion to quash on August 24, 2020, ECF No. 32, to which the Ports Authority replied on September 3, 2020, ECF No. 37.  The court held a hearing on the matters on September 17, 2020.  As such, the instant motions have been fully briefed and are ripe for review.

## II.  STANDARD

### A.  Motion to Quash

Pursuant to Rule 45 of the Federal Rules of Civil Procedure, "[a] command in a subpoena to produce documents, electronically stored information, or tangible things requires the responding person to permit inspection, copying, testing, or sampling of the materials."  Fed. R. Civ. P. 45(a)(1)(D).  "Rule 45 adopts the standard codified in Rule 26 in determining what is discoverable."  Artis v. Murphy-Brown LLC, 2018 WL 3352639, at *2 (E.D.N.C. July 9, 2018).  Pursuant to Rule 26,

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Despite this broad scope of discovery, the court may limit discovery, including subpoenas, if "the discovery sought is unreasonably cumulative or duplicative, or can be

obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C)(i).

### B. Motion for Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed--but early enough not to delay trial--a party may move for judgment on the pleadings." Courts follow "a fairly restrictive standard" in ruling on 12(c) motions, as "hasty or imprudent use of this summary procedure by the courts violates the policy in favor of ensuring to each litigant a full and fair hearing on the merits of his or her claim or defense." 5C Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 1368 (3d ed. 2011). Therefore, "a Rule 12(c) motion for judgment on the pleadings is decided under the same standard as a motion to dismiss under Rule 12(b)(6)." Deutsche Bank Nat'l Trust Co. v. I.R.S., 361 F. App'x 527, 529 (4th Cir. 2010); see also Massey v. Ojaniit, 759 F.3d 343, 353 (4th Cir. 2014) ("[W]e are mindful that a Rule 12(c) motion tests only the sufficiency of the complaint and does not resolve the merits of the plaintiff's claims or any disputes of fact."). Although they share a standard, a motion for judgment on the pleadings differs from a motion to dismiss in that the former allows the court to consider matters outside of the complaint, where the latter generally does not. In resolving a motion for judgment on the pleadings, the court may consider the pleadings and exhibits attached thereto, relevant facts obtained from the public record, and exhibits to the motion that are "integral to the complaint and authentic." Massey, 759 F.3d at 347.

When considering a Rule 12(c) motion for judgment on the pleadings, the court must accept the plaintiff's factual allegations as true and draw all reasonable inferences in the plaintiff's favor. E.I. du Pont de Nemours & Co. v. Kolon Indus., 637 F.3d 435, 440

(4th Cir. 2011); see also BET Plant Servs., Inc. v. W.D. Robinson Elec. Co., 941 F. Supp. 54, 55 (D.S.C. 1996) ("[A] defendant may not prevail on a motion for judgment on the pleadings if there are pleadings that, if proved, would permit recovery for the plaintiff."). But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). On a motion for judgment on the pleadings, the court's task is limited to determining whether the complaint states a "plausible claim for relief." Id. at 679. Although Rule 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief," "a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Instead, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570).

## III. DISCUSSION

### A. Motion to Quash

The Ports Authority is a third party to this lawsuit that owns the Union Pier Terminal, on which Frontier operates its facility. On August 5, 2020, plaintiffs served the Ports Authority with a subpoena, commanding it to produce

> all documents [ ] relating to alleged release(s) of plastic pellets into the environment from any property owned by [the Ports Authority], including Union Pier; all documents exchanged with any employee or representative of Frontier Logistics, L.P., SCDHEC, or any other entity relating to plastic pellet pollution in Charleston waters[.]

ECF No. 29-4 at 1. By email dated August 14, 2020, the Ports Authority informed plaintiffs that it had no duty to comply with the subpoena based on its assertion of

sovereign immunity and "strongly urge[d]" plaintiffs to instead file a request for the desired records under the South Carolina Freedom of Information Act ("SCFOIA"). ECF No. 29-5. Plaintiffs responded on August 17, 2020, disagreeing with the Ports Authority's assertion of sovereign immunity and noting their intention to file a motion to compel with the court. The Ports Authority claims that it intends to treat the subpoena as an SCFOIA request "and produce any responsive, non-exempt documents to [p]laintiffs." ECF No. 29-3 at 3. Plaintiffs continued to demand compliance with the subpoena, and on August 19, 2020, the Ports Authority filed the instant motion to quash.

In its motion, the Ports Authority argues that the court should quash the subpoena for two reasons. First, it argues that the court does not have jurisdiction to enforce the subpoena under the Eleventh Amendment and the doctrine of state sovereign immunity. Second, the Ports Authority argues that its treatment of the subpoena as a SCFOIA request moots the issue. Disagreeing on both points, the court denies the motion.

## 1. Sovereign Immunity

The Ports Authority argues that "[p]laintiffs' subpoena is ineffective against the Ports Authority because sovereign immunity and the Eleventh Amendment preclude the exercise of federal judicial power over it, including the issuance of a subpoena." ECF No. 29-3 at 3. Plaintiffs disagree, contending that "sovereign immunity does not bar a Rule 45 subpoena served on a non-party State entity." ECF No. 32 at 3. As such, the court must determine whether the doctrine of state sovereign immunity precludes a federal court from enforcing a subpoena against a state agency. On the one hand, clear Fourth Circuit precedent establishes that the doctrine of federal sovereign immunity precludes a state court from enforcing a subpoena against a federal agency. The Ports

Authority urges that this well-settled doctrine compels the court's conclusion that the same is true of the inverse, i.e., that state sovereign immunity precludes a federal court from enforcing a subpoena against an arm of the state.  On the other hand, several district courts have held that the inverse does not apply and have compelled state agencies to comply with federal subpoenas.  Moreover, as plaintiffs point out, the Ports Authority does not cite to any cases in which a court has refused to enforce a federal subpoena against a state agency on sovereign immunity grounds.

As the parties recognize, this question remains open in the Fourth Circuit. Virginia Dep't of Corr. v. Jordan, 921 F.3d 180, 188 (4th Cir.), cert. denied, 140 S. Ct. 672 (2019) ("[T]his Circuit has not addressed whether a subpoena issued against a nonparty state agency—not merely a state official—runs afoul of that state's sovereign immunity.").   After considering the doctrines of state and federal sovereign immunity and the principles that undergird each, the court agrees with plaintiffs and holds that the doctrine of state sovereign immunity does not preclude a court from enforcing the subpoena against the Ports Authority or any of its employees.

The Eleventh Amendment encapsulates the basic principles of sovereign immunity, a multi-faceted doctrine that pre-dates the Amendment's ratification in 1794[1]: "The Judicial power of the United States shall not be construed to extend to any suit in

---

[1] As the Ports Authority points out, the Eleventh Amendment is the constitutional recognition of the doctrine of sovereign immunity; it is not the source from which the states derive the protections of sovereign immunity.  See Alden v. Maine, 527 U.S. 706, 713 (1999) ("The phrase ['Eleventh Amendment immunity'] is convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment.  Rather, as the Constitution's structure, its history, and the authoritative interpretations by this Court make clear, the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today[.]").

law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The general pronouncement of sovereign immunity is that a citizen cannot maintain a suit against the government. The question before the court, then, is whether the court's enforcement of a subpoena against an arm of the state is equivalent to a private suit against the state, such that the doctrine of sovereign immunity precludes it.

The Supreme Court has held that "the general rule" of sovereign immunity "is that a suit is against the sovereign if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.'" Dugan v. Rank, 372 U.S. 609, 620 (1963) (internal citations omitted). As the case law demonstrates, courts interpret this general rule differently as it applies to state governments and the federal government, according to the distinct principles that undergird the doctrine of sovereign immunity with respect to each. See Joseph D. Block, Suits Against Government Officers and the Sovereign Immunity Doctrine, 59 HARV. L. REV. 1060, 1064-65 (1946) (distinguishing federal from state sovereign immunity). In other words, "federal sovereign immunity in federal court is based on different principles from state sovereign immunity in the same venue," and courts' application of the doctrine depends on those differing principles. Jennifer Lynch, The Eleventh Amendment and Federal Discovery: A New Threat to Civil Rights Litigation, 62 FLA. L. REV. 203, 246 (2010). Generally, state sovereign immunity protects principles of federalism, and federal sovereign immunity protects separation-of-powers principles as well as the

concept of federal supremacy.  Id.; Boron Oil Co. v. Downie, 873 F.2d 67, 71 (4th Cir.

1989).

As the Ports Authority notes, the Fourth Circuit has recognized that the doctrine

of federal sovereign immunity precludes a state court from compelling a third-party

federal agency to act in compliance with a subpoena.

> Even though the government is not a party to the underlying action, the
> nature of the subpoena proceeding against a federal employee to compel
> him to testify about information obtained in his official capacity is
> inherently that of an action against the United States because such a
> proceeding "interfere[s] with the public administration" and compels the
> federal agency to act in a manner different from that in which the agency
> would ordinarily choose to exercise its public function.  The subpoena
> proceedings fall within the protection of sovereign immunity even though
> they are technically against the federal employee and not against the
> sovereign.

Boron Oil, 873 F.2d at 71 (internal citations omitted).  In so holding, the Fourth Circuit

relied on one of the bedrock constitutional principles that undergirds the doctrine of

federal sovereign immunity, federal supremacy:

> The principle of federal supremacy reinforces the protection of sovereign
> immunity in the case at bar.  The assertion of state court authority to
> override the EPA's [ ] regulations clearly violates the Constitution's
> Supremacy Clause.  First, Congress has expressly limited Administrative
> Procedure Act review to the federal courts, and a state court's assertion of
> the power of judicial review over federal agencies directly contravenes 5
> U.S.C. § 702.  Second, properly promulgated agency regulations
> implementing federal statutes have the force and effect of federal law which
> state courts are bound to follow.  The action of a state court to compel an
> official of a federal agency to testify contrary to the agency's duly enacted
> regulations clearly thwarts the purpose and intended effect of the federal
> regulations.  Such action plainly violates both the spirit and the letter of the
> Supremacy Clause.

Id. (citing Chrysler Corp. v. Brown, 441 U.S. 281, 295–96 (1979)).

Of course, the underlying principle of federal supremacy does not apply in the

context of state sovereign immunity.  Instead, the doctrine of state sovereign immunity is

enforced by principles of federalism.  See Fed. Mar. Comm'n v. S.C. State Ports Auth., 535 U.S. 743, 765 (2002) ("While state sovereign immunity serves the important function of shielding state treasuries and thus preserving 'the States' ability to govern in accordance with the will of their citizens,' [ ] the doctrine's central purpose is to 'accord the States the respect owed them as' joint sovereigns.").  Accordingly, the Ports Authority, despite its citation to Boron Oil, relies on principles of federalism for its argument that state sovereign immunity precludes the court's enforcement of plaintiffs' subpoena.  The problem with the Ports Authority's argument is that a federal court's enforcement of a subpoena against a state agency does not significantly infringe on federalism's promise of dual independent sovereigns.  As such, courts throughout the county have found that a federal subpoena against a third-party state agency does not constitute "a suit against the sovereign" for the purposes of state sovereign immunity and thus does not invoke the doctrine's protections.

For example, a California district court, faced with the same issue, held that "the Eleventh Amendment does not apply to preclude discovery from a State agency" because "a discovery request" does not constitute "a suit or suing the state within the meaning of the Eleventh Amendment."  Allen v. Woodford, 544 F. Supp. 2d 1074, 1079 (E.D. Cal. 2008).  A district court within the Fourth Circuit reached the same conclusion, holding that state sovereign immunity does not immunize a state agency from federal discovery requests because a subpoena served on a state agency does not constitute "suit" against a state.  Arista Records LLC v. Does 1-14, 2008 WL 5350246, at *4 (W.D. Va. Dec. 22, 2008) (unpublished memorandum opinion).

The Arista Records court relied on a Court of Appeals opinion in which the Seventh Circuit found that a discovery request upon a state agency did not constitute a suit against the state because it did not raise significant federalism concerns:

> The writ [seeking enforcement of a subpoena] in this case would if granted be like an order commanding a state official who is not a party to a case between private persons to produce documents in the state's possession during the discovery phase of the case; such orders, because they do not compromise state sovereignty to a significant degree, do not violate the Eleventh Amendment.

Barnes v. Black, 544 F.3d 807, 812 (7th Cir. 2008) (internal citations omitted). The Eighth Circuit, considering the same issue, similarly concluded, "There is simply no authority for the position that the Eleventh Amendment shields [state] government entities from discovery in federal court." In re Missouri Dep't of Nat. Res., 105 F.3d 434, 436 (8th Cir. 1997). The court agrees with the rationale of these courts and finds that requiring the Ports Authority to produce documents or witnesses responsive to a federal subpoena is not a "suit against the sovereign" because it does not implicate significant federalism concerns.

In sum, several courts have held that the doctrine of state sovereign immunity does not preclude federal courts from enforcing subpoenas against third-party state agencies. While the Fourth Circuit has held that the doctrine of federal sovereign immunity protects non-party federal agencies from enforcement of state subpoenas, the court premised that conclusion upon the principle of federal supremacy, which is inapplicable in the context of state sovereign immunity. The principle that underlies the doctrine of state sovereign immunity is federalism, which courts have found is not undermined when a federal court enforces a subpoena against a state agency. As such, the court finds that state sovereign immunity does not apply to plaintiffs' subpoena.

### 2.  Mootness

Next, the Ports Authority argues that the court should not enforce the subpoena because "the Ports Authority's treatment of the subpoena as a request under [SCFOIA] should render the matter moot." ECF No 29-3 at 7.  In response, plaintiffs argue that because "a[n] [SC]FOIA request and a subpoena subject the responding party to completely different disclosure requirements and provide the requesting party completely different recourse for non-compliance," the Ports Authority's solution does not moot the matter.  ECF No. 32 at 7.  Indeed, SCFOIA provides a state entity with multiple exemptions from disclosure that do not apply to a subpoena, such as "for trade secrets, information of a personal nature, matters specifically exempted from disclosure by statute or law, and documents incidental to proposed contractual arrangements." Id. (citing S.C. Code Ann. § 30-4-40).  Subpoenas, on the other hand, are subject only to the general discovery limitations of relevancy and privilege. Artis, 2018 WL 3352639, at *2 ("Rule 45 adopts the standard codified in Rule 26 in determining what is discoverable."). Further, SCFOIA would require plaintiffs to file a separate state court action if it found the Ports Authority's responses to be inadequate, whereas the authority to enforce a subpoena lies with this court.  As such, the court finds that the Ports Authority's treatment of the subpoena as a request under SCFOIA does not render the matter moot.[2] Thus, the court denies the motion to quash.

---

[2] At the hearing, the Ports Authority noted that it has completed its production under SCFOIA and that it would have produced identical documents had the Ports Authority complied with the subpoena.  However, as plaintiffs point out, production pursuant to SCFOIA is nevertheless materially different than production pursuant to a Rule 45 subpoena.  For example, in its production, the Ports Authority withheld documents on the basis of attorney-client privilege.  Under SCFOIA, the Ports Authority would not be compelled to produce a privilege log; however, to properly comply with the

### B. Motion for Judgment on the Pleadings

Frontier submits several theories that it contends entitle it to judgment on the pleadings. First, Frontier argues that plaintiffs have failed to demonstrate that they have standing to bring the instant suit. Next, Frontier argues that plaintiffs have failed to state a proper claim with respect their claim under the RCRA and their claim under the CWA. Finally, Frontier argues that plaintiffs are prohibited from bringing simultaneous claims under the RCRA and the CWA based on the same injury. The court discusses each theory in turn, finding that none warrant judgment.

Before delving into Frontier's specific arguments, the court finds warranted a brief discussion of a thematic shortcoming that permeates Frontier's motion and renders it fatally flawed. The standard with which a court considers a motion to dismiss, and consequently a motion for judgment on the pleadings, is relatively straightforward. Nevertheless, Frontier attempts at every turn to convolute the inquiry before the court, impermissibly elevating plaintiffs' burden with each hair that it splits. For example, emblematic of its legal strategy, Frontier repeatedly argues that plaintiffs have "failed to allege sufficient facts to establish" some "necessary" showing. See, e.g., ECF No. 23 at 14, 17, 25, 26, and 33. Consistent with the rest of Frontier's filings pending with court, the phrase "failed to allege sufficient facts to establish" is a nonsensical misapplication of the law. Of course, allegations can establish nothing, and, at this stage of litigation, a plaintiff does not need to "establish" any facts nor present any evidence to meet its

---

subpoena, the Ports Authority is required to produce a privilege log that corresponds to the withheld documents. As such, the fact that SCFOIA and the subpoena compel the production of the same documents in this case does not remove the controversy before the court and does not moot the issue.

modest burden of stating a plausible claim for relief.  To be exceedingly clear, a motion

for judgment on the pleadings tests only the sufficiency of the complaint, and, to survive

such a motion, a plaintiff need only allege plausible facts, which, if true, would entitle

him or her to relief.  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570).  Had

Frontier grasped this elementary principle of civil procedure, the court imagines it might

have thought better than to file the instant motion.

### 1.  Standing

Frontier first argues that plaintiffs "do not meet any of the requirements for

standing either on their own or as representative of their members."  ECF No. 23 at 9.

This ground of Frontier's motion is premised upon its fundamental misunderstanding of

plaintiffs' burden.  Because plaintiffs have sufficiently demonstrated standing by

pleading good-faith, plausible allegations, the court rejects Frontier's standing argument.

"[T]he irreducible constitutional minimum of standing contains three elements."

Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992).  First, a plaintiff must demonstrate

an "injury-in-fact", which is a "concrete and particularized . . . invasion of a legally

protected interest."  Id.  Second, "there must be a causal connection between the injury

and the conduct complained of, meaning that the injury must be "fairly . . . trace[able] to

the challenged action of the defendant."  Id.  Third, "it must be likely, as opposed to

merely speculative, that the injury will be redressed by a favorable decision."  Id.  Where

the plaintiff is an organization, it must clear additional hurdles.  An organization has

associational standing when "(1) at least one of its members would have standing to sue

in his own right; (2) the organization seeks to protect interests germane to the

organization's purpose; and (3) neither the claim asserted nor the relief sought requires

the participation of individual members in the lawsuit."  Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 155 (4th Cir. 2000) (citing Hunt v. Washington State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977)).

Importantly, the overriding motion-to-dismiss standard applies to the inquiry of standing, meaning that "a suit will not be dismissed for lack of standing if there are sufficient 'allegations of fact'—not proof—in the complaint or supporting affidavits." Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 65 (1987).  In other words, plausible, good-faith allegations that, if true, would satisfy the standing requirements, sufficiently demonstrate standing and preclude dismissal (or, consequently, judgment on the pleadings).  See id.; see also Iqbal, 556 U.S. at 678.

Frontier argues that plaintiffs have failed to "establish" each element of the traditional standing inquiry—that plaintiffs have not demonstrated an injury-in-fact, or that the injury is fairly traceable to Frontier's conduct, or that the requested relief would redress the injury.  With respect to the "injury-in-fact" element, plaintiffs have clearly alleged that their members suffered "concrete and particularized" invasions of legally protected interests.  See Compl. ¶ 13 ("Plaintiff organizations and their members have significant, particularized, and concrete interests in preventing Frontier's pollutant discharges from the Facility and the resulting endangerment to the environment. Plaintiffs' members live near, recreate on, and regularly visit the Cooper River and other Charleston waters and beaches harmed by Frontier's discharges, and intend to recreate on and visit these waters and beaches in the future.  These individuals use and enjoy Charleston waters and beaches for recreational, commercial, educational, conservation,

16

and aesthetic purposes, including, but not limited to, boating, scuba diving, swimming, fishing, and sightseeing.").

Frontier submits a convoluted argument that plaintiffs' allegations of injury are not sufficiently imminent, are too generalized, and constitute only aesthetic injuries. ECF No. 23 at 9–11. Again, Frontier's argument with respect to this element improperly complicates the law and elevates plaintiffs' burden. In reality, the law is simple: "In the environmental litigation context, the standing requirements are not onerous. Environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." Am. Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 517 (4th Cir. 2003) (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 183 (2000). Plaintiffs' allegations clearly satisfy the injury-in-fact prong, and Frontier's arguments to the contrary are meritless.

Likewise, plaintiffs' allegations satisfy the traceability requirement. The complaint contains several allegations that connect the plaintiffs' alleged injury to Frontier's alleged conduct. As just one example, the complaint cites to an incident report DHEC drafted shortly after the July 2019 spill, in which DHEC noted "numerous areas of concern" at Frontier's facility, "[p]lastic accumulation throughout the facility," and "numerous openings throughout the facility" that were "directly over water." Compl. ¶ 36. The complaint also alleges that large-scale sampling and collection efforts revealed the highest concentration of pellets at the sites nearest to Frontier's facility, id. at ¶ 53, that plaintiffs collected plastic pellets along the fence line of Frontier's facility which resemble the pellets recovered from Charleston waters, id. at ¶ 55, and that chemical

analysis demonstrated that recovered pellets were made of polyethylene, the type of plastic handled by Frontier, id. at ¶ 56.

Again, Frontier submits its fundamentally flawed arguments in opposition—that plaintiffs' allegations are "pure speculation" and do not "establish [ ] a causal link between" the pellets Frontier handled and the pellets they have collected.  ECF No. 23 at 14.  At the risk of belaboring the point, the court reiterates that plaintiffs need not "establish" anything at this juncture and must only plead plausible, good-faith allegations that the alleged environmental damage is traceable to Frontier.  Clearly, the complaint sufficiently alleges that the injury is "fairly . . . trace[able] to the challenged action of the defendant,"  Lujan, 504 U.S. at 560, and even goes well beyond what the standard requires.  Frontier's argument to the contrary is specious.

Similarly, plaintiffs satisfy the redressability requirement of the standing inquiry.  The thrust of Frontier's argument with respect to the redressability prong is that because "there is no ongoing or impending violations, . . . no benefit can come from this Court's intervention."  ECF No. 23 at 16.  Again, this argument ignores the law and the plain language of plaintiffs' allegations.  The complaint includes clear allegations that Frontier continues to discharge pollutants into Charleston's waters and that injunctive relief would redress plaintiffs' injury by stopping those discharges.  See Compl. ¶ 14 ("Neither DHEC nor the EPA is actively enforcing environmental laws and regulations despite the ongoing violations, which began on and have continued since at least March 10, 2018 . . . . Relief from this Court addressing Frontier's noncompliance with RCRA and the CWA would redress the injuries of Plaintiff organizations and their members by increasing the likelihood, if not ensuring, that Frontier will cease its pollutant discharges and eliminate

the endangerment to the environment.") (emphasis added); id. at ¶ 87 ("Because Frontier

has implemented insufficient prevention, containment, and cleanup procedures for plastic

pellet spills, it is likely that its discharges into the Cooper River are ongoing, and thus,

that its violation of the CWA are ongoing.").  In short, plaintiffs have alleged ongoing

pollution and now request an injunction to stop that pollution.  Such allegations are more

than sufficient to demonstrate redressability.  See Laidlaw, 528 U.S. at 185 (finding that

even a bare a request for civil penalties can redress an environmental injury because "all

civil penalties have some deterrent effect").  Having rejected each of Frontier's

arguments, the court finds that plaintiffs have sufficiently demonstrated standing.

### 2.  Failure to State a Claim under RCRA

In its motion for judgment on the pleadings, Frontier also argues that plaintiffs

have failed to state a valid claim under the RCRA.  In support, Frontier presents a litany

of arguments, each of which the court addresses in turn and rejects as meritless.

The "RCRA is a comprehensive environmental statute that governs the treatment,

storage, and disposal of solid and hazardous waste."  Goldfarb v. Mayor & City Council

of Baltimore, 791 F.3d 500, 504 (4th Cir. 2015) (quoting Meghrig v. KFC W., Inc., 516

U.S. 479, 483 (1996)).  While the EPA retains the chief responsibility for implementing

and enforcing its provisions, the RCRA empowers private citizens to "commence a civil

action . . . against any person . . . who has contributed or who is contributing to the past

or present handling, storage, treatment, transportation, or disposal of any solid or

hazardous waste which may present an imminent and substantial endangerment to health

or the environment."  42 U.S.C. § 6972(a)(1)(A).  To state a claim under the RCRA, a

plaintiff must allege:

19

>(1) that the defendant is a person, including, but not limited to, one who was or is a generator or transporter of solid or hazardous waste or one who was or is an owner or operator of a solid or hazardous waste treatment, storage, or disposal facility; (2) that the defendant has contributed to or is contributing to the handling, storage, treatment, transportation, or disposal of <u>solid or hazardous waste</u>; and (3) that the solid or hazardous waste may present an imminent and substantial endangerment to health or the environment.

<u>Interfaith Cmty. Org. v. Honeywell Int'l, Inc.</u>, 399 F.3d 248, 258 (3d Cir. 2005) (quoting

<u>Parker v. Scrap Metal Processors, Inc.</u>, 386 F.3d 993, 1014 (11th Cir. 2004)) (emphasis

added).

Requesting judgment on plaintiffs' claim under the RCRA, Frontier first argues

that the pellets handled at Frontier's facility are not "solid waste", as the statute requires.

The RCRA defines "solid waste" as "any garbage, refuse, sludge . . . and <u>other discarded</u>

<u>material</u>, including solid, liquid, semisolid, or contained gaseous material resulting from

industrial, commercial, mining, and agricultural operations, and from community

activities . . . ." 42 U.S.C. § 6903(27) (emphasis added).  In determining whether a

product constitutes "discarded material," courts have considered: "(1) whether the

material is destined for beneficial reuse or recycling in a continuous process by the

generating industry itself; (2) whether the materials are being actively reused, or whether

they merely have the potential of being reused; [and] (3) whether the materials are being

reused by its original owner, as opposed to use by a salvager or reclaimer." <u>Safe Air for</u>

<u>Everyone v. Meyer</u>, 373 F.3d 1035, 1043 (9th Cir. 2004) (internal citations and quotation

marks omitted).

Frontier explains that its pellets do not constitute "discarded material" because

"the pellets that are handled at Frontier's facility have yet to serve their intended use and

purpose."  ECF No. 23 at 21.  Like each of Frontier's other arguments, this argument also

stands on a flawed foundation because it is premised upon a misinterpretation of the law. Frontier seizes upon one cherry-picked excerpt from a Ninth Circuit opinion, which states, "The key to whether a manufactured product is a 'solid waste,' then, is whether that product 'has served its intended purpose and is no longer wanted by the consumer.'" Ecological Rights Found. v. Pac. Gas & Elec. Co., 713 F.3d 502, 516 (9th Cir. 2013). Frontier relies on this statement of the law without regard to its context, arguing that a product must have reached the consumer and then been discarded to constitute "discarded material" and thus "solid waste." A closer reading of the case, and the overwhelming relevant case law, reveals that Frontier is again incorrect.

In Ecological Rights, the Ninth Circuit found that wood preservative was not "solid waste" within the meaning of the RCRA because the defendant used the preservative at issue for its intended purpose. Id. The Ninth Circuit reasoned that because the defendant intentionally applied the wood preservative onto its utility poles, the preservative was "being used for its intended purpose" and thus was not "discarded material" within the meaning of the RCRA. Id. As such, Ecological Rights stands for the common-sense proposition that a product being used for its intended purpose is not "solid waste" when that product escapes into the environment as a natural consequence of its use. The Second Circuit reached the same conclusion with respect to pesticides. No Spray Coal., Inc. v. City of New York, 252 F.3d 148, 150 (2d Cir. 2001) (finding that "pesticides are not being 'discarded' when sprayed into the air with the design of effecting their intended purpose: reaching and killing mosquitoes and their larvae"). There is no question that discharge into the Charleston Harbor was not the intended use of the plastic pellets at issue here. Therefore, Frontier's plastic pellets are totally

different from the wood preservative in <u>Ecological Rights</u> and the pesticides in <u>No Spray Coal</u>, as plaintiffs allege that they were "discarded" into Charleston's waters rather than put to their intended use. Moreover, the case law contradicts Frontier's assertion that a product must reach the consumer and be used for its ultimate purpose to constitute "solid waste."

Far more analogous to the instant case are the cases plaintiffs present, which much more accurately reflect the expansive way in which courts have interpreted the term "solid waste" under the RCRA. For example, the Eastern District of Washington found that leaked cow manure constituted "solid waste", distinguishing an intentionally used, beneficial product, like the wood preservative in <u>Ecological Rights</u> and the pesticides in <u>No Spray Coal</u>, from an abandoned product:

> [T]he manure leaking from Defendants' lagoons is not a natural, expected consequence of the manure's use or intended use but rather a consequence of the poorly designed temporary storage features of the lagoons. The consequence of such permeable storage techniques, thus, converts what would otherwise be a beneficial product (the stored manure) into a solid waste (the discarded, leaching constituents of manure) under RCRA because the manure is knowingly abandoned to the underlying soil.
>
> [ . . . ]
>
> Accordingly, because the manure stored in the Dairy's lagoons is accumulating in the environment—possibly at accumulation rates of millions of gallons per year—as a consequence of the lagoons' storage design, it is properly characterized as a discarded material and thus a "solid waste" under RCRA.

<u>Cmty. Ass'n for Restoration of the Env't, Inc. v. Cow Palace, LLC</u>, 80 F. Supp. 3d 1180, 1223 (E.D. Wash. 2015). Indeed, the overwhelming case law holds that a product becomes "discarded material" and thus "solid waste" when it is abandoned by a defendant and ceases to be useful. <u>See Craig Lyle Ltd. P'ship v. Land O'Lakes, Inc.</u>, 877

F. Supp. 476, 481–82 (D. Minn. 1995) (finding spilt petroleum to be "solid waste" because "although petroleum is a useful product, petroleum leaked into soil or groundwater ceases to be useful [and] cannot be used for its intended purpose[, which] comports with being abandoned"); Agric. Excess & Surplus Ins. Co. v. A.B.D. Tank & Pump Co., 878 F. Supp. 1091, 1095 (N.D. Ill. 1995) ("[L]eaked gasoline from an underground storage tank is no longer useful and is appropriately defined as discarded material or solid waste."); Zands v. Nelson, 779 F. Supp. 1254, 1262 (S.D. Cal. 1991) (same).

The court finds the plastic pellets here far more akin to spilt petroleum and leaked cow manure than to wood preservative or pesticides. The distinction is clear—those products in the former group were abandoned and ceased to have any beneficial purpose, while those in the latter were released into the environment pursuant to their design to serve an intended purpose. The plastic pellets never reached their destination and never realized their intended use; instead, plaintiffs allege that Frontier abandoned the pellets into the Charleston waterways, stripping the pellets of any potential beneficial purpose and rendering them harmful to the environment. As such, the court agrees with plaintiffs that the plastic pellets constitute "discarded material" and thus "solid waste" under the RCRA.

Because Frontier's remaining arguments with respect to the RCRA are similar to its standing arguments, and fail for the same reasons, the court addresses them only briefly. First, Frontier argues that plaintiffs have failed to "establish" that the pellets at Frontier's facility "present a risk of harm to health or the environment" because plaintiffs fail to "allege facts sufficient to make an evidentiary link" between the pellets handled at

Frontier's facility and the ones recovered by plaintiffs in Charleston waters. ECF No. 23 at 23. Again, this argument convolutes the law and raises plaintiffs' burden, which does not require plaintiffs to present evidence or "establish" facts. For the reasons discussed above, plaintiffs have sufficiently pleaded plausible allegations that Frontier spilled plastic pellets into the Charleston harbor and that those plastic pellets present a risk of harm to the environment. Such a finding ends the court's inquiry at this stage of litigation. As such, the court rejects Frontier's "risk of harm" argument.

Next, Frontier argues that plaintiffs have failed to allege that the pellets present an "imminent threat of injury", ECF No. 23 at 24, or a pose "substantial danger", id. at 26. To the contrary, the complaint contains sufficient allegations as to both. For example, plaintiffs allege that they have "collected a total of 14,281 plastic pellets" since July 2019, Compl. ¶ 52, and that they "continue to find plastic pellets in significant concentrations at sites across the Charleston area, particularly those closest to [Frontier's] Facility," id. ¶ 58. Moreover, plaintiffs have alleged, with considerable detail, the harmful environmental effects that the spilled plastic pellets pose. Compl. ¶¶ 59–70 (detailing the ways in which "[p]lastics, including plastic pellets, have been demonstrated to cause a variety of lethal and sub-lethal effects in animals"). As such, the court rejects Frontier's arguments and denies its motion to dismiss with respect to plaintiffs' claim under the RCRA.[3]

---

[3] To the extent that Frontier argues that the RCRA demands an ongoing violation, that assertion is incorrect. See United States v. Waste Indus., Inc., 734 F.2d 159, 165 (4th Cir. 1984) (holding that the RCRA stands as a "means to respond to disasters precipitated by earlier poor planning"). Moreover, even if Frontier were correct on the law, plaintiffs have alleged that Frontier's violations are ongoing, as discussed above.

### 3.  Failure to State a Claim under the CWA

Frontier contends that the court must dismiss plaintiffs' claims under the CWA because plaintiffs have failed to "sufficiently allege a continuing and ongoing violation of the [CWA]."  ECF No. 30.  Plaintiffs, in response, argue that the complaint asserts good-faith allegations of continued violations, which is all the law requires.  Once again, the law is on plaintiffs' side.

The CWA provides, "any citizen may commence a civil action on his own behalf . . . against any person [ ] who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation . . . ."  33 U.S.C. § 1365(a).  Because Congress wrote the statute in the present tense, the Supreme Court has held that "a natural reading" of the statue imposes a "requirement that citizen-plaintiffs allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future."  Gwaltney, 484 U.S. at 57.  "Conversely, when a violation of the CWA is 'wholly past,' the federal courts do not have jurisdiction to entertain a citizen suit, even if the past discharge violated the CWA."  Upstate Forever v. Kinder Morgan Energy Partners, L.P., 887 F.3d 637, 646 (4th Cir. 2018), cert. granted, vacated on other grounds, 206 L. Ed. 2d 916 (May 4, 2020).  Importantly, to survive a motion to dismiss, a plaintiff need only plead "good-faith allegations", "well-grounded in fact", that the defendant's violations are ongoing.  Id. at 65.

Here, the complaint includes clear allegations of ongoing violations, alleged in good faith and grounded in fact.  See Compl. ¶ 14 ("Neither DHEC nor the EPA is actively enforcing environmental laws and regulations despite the ongoing violations,

which began on and have continued since at least March 10, 2018."); id. ¶ 58 ("As of the filing of this Complaint, after six months of concerted sampling, the Waterkeeper continues to find plastic pellets in significant concentrations at sites across the Charleston area, particularly those closest to the Facility."); id. ¶ 86 ("Each and every discharge of plastic pellets and each and every day plastic pellets remain in waters is a separate and distinct violation of Section 301(a) of the CWA."); id. ¶ 87 ("Because Frontier has implemented insufficient prevention, containment, and cleanup procedures for plastic pellet spills, it is likely that its discharges into the Cooper River are ongoing, and thus, that its violation[s] of the CWA are ongoing.").  As such, plaintiffs' complaint clearly satisfies Gwaltney's requirement that a plaintiff allege ongoing CWA violations.

Moreover, the court's denial of Frontier's motion on this ground is consistent with the principles that underlie the plaintiffs' modest burden at this stage in litigation. PennEnvironment v. PPG Indus., Inc., 964 F. Supp. 2d 429, 470–71 (W.D. Pa. 2013) (finding that courts should be wary of granting a motion to dismiss on this ground because "whether intermittent or sporadic violations are ongoing or wholly past requires evidence," which is more appropriately addressed on summary judgment).  The court again declines to grant Frontier judgment before discovery has provided plaintiffs the opportunity to gather evidence.  See Sierra Club v. Union Oil Co. of California, 853 F.2d 667, 669 (9th Cir. 1988) ("If the defendant wishes to argue that the allegations are untrue, . . . the defendant must move for summary judgment and demonstrate that 'the allegations were sham and raised no genuine issue of fact.'").  As such, the court denies Frontier's motion for judgment on the pleadings with respect to plaintiffs' CWA claim.

#### 4.   Simultaneous Claims under the RCRA and CWA

Finally, Frontier argues that "[p]laintiffs cannot bring simultaneous claims alleging that pellets at Frontier's facilities are both 'solid waste' for purposes of the RCRA and 'discharges' under the CWA." ECF No. 23 at 33. Plaintiffs respond that Frontier's argument "rises and falls on one fatal assumption"—that each pellet spilled must either be a "discharge" or "solid waste". ECF No. 26 at 28. In fact, plaintiff explain, pellets leave Frontier's facility through various pathways, meaning that "[s]ome may be 'point source discharges' subject to the CWA, whereas others may be 'solid waste' subject to the RCRA." Id. Because plaintiffs are entitled to plead claims "in the alternative" under Fed. R. Civ. P. 8(d)(3), plaintiffs conclude, the court may not compel the plaintiffs to choose a theory at this stage of litigation, prior to discovery. The court agrees.

To be sure, Frontier is correct that a spilled substance cannot simultaneously constitute "solid waste" under the RCRA and a "discharge" under the CWA. The RCRA's definition of "solid waste" specifically excludes "solid or dissolved material in domestic sewage, or solid or dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under [the CWA]." 42 U.S.C. § 6903(27). As such, courts have found that a substance cannot satisfy both the RCRA's definition of "solid waste" and qualify as a "point source discharge" under the CWA. See Little Hocking Water Ass'n, Inc. v. E.I. du Pont Nemours & Co., 91 F. Supp. 3d 940, 959–60 (S.D. Ohio 2015) ([D]ischarges in their entirety are not 'solid waste' under RCRA if they are subject to the CWA [ ] permit scheme."). Although Frontier is finally correct on the law, it is wrong on the application of that law to the facts.

Plaintiffs may maintain simultaneous claims under the CWA and the RCRA for two reasons.  One, while a single pellet may not simultaneously constitute both "solid waste" and a "point source discharge", plaintiffs allege that Frontier spilled far more than one pellet and each individual pellet allegedly spilled by Frontier may constitute either "solid waste" or a "point source discharge" depending upon how it was spilled.  For example, plaintiffs allege that Frontier spilled plastic pellets on land, Compl. ¶¶ 37–40, meaning that those pellets would constitute "solid waste" because they would not be subject to the CWA's permitting scheme.  Plaintiffs also allege that Frontier discharges other pellets into water systems, meaning that the CWA, and not the RCRA, would apply to those pellets.  As such, plaintiffs have plausibly alleged that certain pellets could be subject to the CWA and others to the RCRA.

Moreover, as plaintiffs explain, "Plaintiffs allege that Frontier spills pellets into the Cooper River through several conveyances, and discovery is needed to ascertain which of these are point sources [subject to the CWA] and which are not [and thus subject to the RCRA]."  ECF No. 26 at 29.  The federal rules specifically permit a plaintiff to plead his or her claims in the alternative where, as here, the plaintiff is unsure on which theory to proceed.  See Fed. R. Civ. P. 8(d)(3).  Thus, plaintiffs are not required to "pick a theory and stick with it" at this stage of litigation.  As such, the court denies Frontier's motion for judgment on the pleadings in full.

### C.  Motion to Strike

Ignoring basic concepts of Rule 12, Frontier has also filed a motion to strike, which it filed contemporaneously with its reply to plaintiffs' response to the motion for judgment on the pleadings.  Responding to Frontier's standing argument, plaintiffs

attached to their response declarations of their members in which the members stated

facts related to their standing to file suit.  Frontier's motion asks the court to strike those

declarations from the record, based on its belief that the court should not consider them in

resolving the motion for judgment on the pleadings.  Because Frontier's request is

entirely devoid of any basis in the law, the court denies the motion.

> Rule 12(f) provides:
>
> The court may strike from a pleading an insufficient defense or any
> redundant, immaterial, impertinent, or scandalous matter.  The court may
> act:
>
> (1) on its own; or
>
> (2) on motion made by a party either before responding to the pleading or,
> if a response is not allowed, within 21 days after being served with the
> pleading.

Fed. R. Civ. P. 12(f).  Motions to strike "are generally viewed with disfavor because

striking a portion of a pleading is a drastic remedy and because it is often sought by the

movant simply as a dilatory tactic."  Waste Mgmt. Holdings v. Gilmore, 252 F.3d 316,

347 (4th Cir. 2001) (internal citations and quotations omitted).  Furthermore, motions to

strike pursuant to Rule 12(f) are directed only to pleadings.  According to Rule 7, a

document is a pleading only if it falls within one of the following categories: complaint,

answer to complaint, answer to a counterclaim, answer to a crossclaim, third-party

complaint, answer to a third-party complaint, and a reply to an answer.  Fed. R. Civ. P.

7(a).

Clearly, Frontier's motion is not directed at a pleading and thus not authorized by

the civil rules.  Putting aside the absence of any basis in the law for the motion, the court

can think of no practical purpose for Frontier's request, other than to inform the court that

it should not consider plaintiffs' declarations in resolving the motion for judgment on the pleadings. In other words, Frontier filed a motion to ensure that the court would apply the correct law to its earlier-filed motion. The staggering irony underlying this request, of course, is that Frontier's own arguments in its motion for judgment on the pleadings demonstrate its consistent failure to grasp even the most fundamental concepts of the applicable law, as the court has been compelled to reiterate in this order ad nauseum. The court ensures Frontier that it has applied the correct law to the motion for judgment on the pleadings, as it has a constitutional duty to do.[4] Frontier does not need to file a motion to strike to remind the court of the correct law to apply, especially where it has already demonstrated to the court a fundamental failure to grasp the law itself. Frontier's motion to strike is denied.

---

[4] More baffling still, Frontier's assertion of the law, which constitutes the entire basis for its motion to strike, is flatly incorrect. A court may look outside the pleadings on a motion to dismiss, or accordingly a motion for judgment on the pleadings, to determine whether plaintiffs have standing. Warth v. Seldin, 422 U.S. 490, 501 (1975) ("[I]t is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing."). While the court did not need to consider plaintiffs' members' declarations to determine that plaintiffs sufficiently demonstrated standing, the law certainly would have authorized it to do so.

## IV.   CONCLUSION

For the reasons set forth above, the court **DENIES** the motion to quash, **DENIES** the motion for judgment on the pleadings, and **DENIES** the motion to strike.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**September 21, 2020**
**Charleston, South Carolina**