IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| CHARLESTON WATERKEEPER and ) <br> SOUTH CAROLINA COASTAL ) <br> CONSERVATION LEAGUE, ) <br> ) <br> Plaintiffs, ) <br> ) <br> vs. ) <br> ) <br> FRONTIER LOGISTICS, L.P., ) <br> ) <br> Defendant. ) <br> ) | No. 2:20-cv-1089-DCN <br><br> **ORDER** |

This matter is before the court on nonparty South Carolina State Ports Authority's ("the Ports Authority") motion to stay, ECF No. 42. For the reasons that follow, the court denies the motion.

## I. BACKGROUND

This is an action filed pursuant to the citizen-suit provisions of the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq. ("RCRA"), and the Clean Water Act ("CWA"), 33 U.S.C. § 1251 et seq. In the summer of 2019, residents of Sullivan's Island and Isle of Palms, South Carolina began discovering BB-sized plastic pellets washing up along the shoreline of their beaches. On July 19, 2019, the South Carolina Department of Health and Environmental Control ("SCDHEC") received a report from a citizen of Sullivan's Island that he encountered pellets along the intercoastal waterway "in the [thousands]." ECF No. 1-1 at 213.

Frontier is a supply chain management service that packages small plastic production pellets, also called "nurdles", into 25-kilogram bags, "stretch-hood[s] or

1

stretch-wrap[s]" the plastic pellets onto pallets, and sells the pallets to manufacturers of plastic goods.  ECF No. 23 at 1.  Frontier operates out of a facility located at the Union Pier Terminal in downtown Charleston, South Carolina, overlooking the Charleston harbor.  On the same day that DHEC received the report of escaped plastic pellets, DHEC notified Frontier "that DHEC was attributing the spill to Frontier and that it should immediately begin the cleanup process."  Id. at 2.  Frontier denied that any pellets originated from its facility but nevertheless implemented increased safety measures to prevent the spill of plastic materials and assisted in the clean-up effort on Sullivan's Island.  After the spill, DHEC conducted two site visits of Frontier's Union Pier facility, after which DHEC officially alleged, by way of a July 26, 2019 letter, that Frontier violated the South Carolina Pollution Control Act.  ECF No. 1-1 at 210.  On August 29, 2019, Frontier responded to the allegation by letter, denying responsibility for the spilled pellets, explaining the extent of the procedures it employs to guard against spills, and notifying DHEC of its participation in the effort to clean up the affected beaches.  ECF No 1-1 at 240–243.  On August 1, 2019, DHEC held an enforcement conference to discuss Frontier's alleged violation.

On October 17, 2019, DHEC sent another letter to Frontier, notifying Frontier that DHEC was closing the investigation into the July 2019 spill without further action.  The letter explained: "During the enforcement conference, Frontier asserted that some of the plastic pellets [DHEC] personnel observed on Sullivan's Island Beach and Isle of Palms Beach were similar to those handled by Frontier; however, other pellets observed by [DHEC] personnel were not the type handled by Frontier."  Id. at 244.  The letter also summarized Frontier's practices and procedures designed to prevent spills and noted

Frontier's participation in the clean-up effort. Ultimately, based upon its "investigation and the supplemental information provided by Frontier," DHEC "determined that the [ ] matter should be closed" without further state action. Id. at 245.

Plaintiffs are both "Charleston-based § 501(c)(3) not-for-profit organization[s]," each organized for an environmental purpose related to preserving and protecting South Carolina's coastland, waterways, and their resources. ECF No. 1, Compl. ¶¶ 11–12. According to the complaint, in September 2019, plaintiffs began to collect and sample spilled plastic pellets at various locations within the Charleston Harbor Watershed as part of "an exhaustive effort" to determine the source of the spilled pellets. ECF No. 26 at 1. In their complaint, plaintiffs allege that they consistently recorded the highest concentration of pellets at the collection sites closest to Frontier's Union Pier facility. Compl. at ¶ 53. Plaintiffs also assert that the plastic pellets recovered "resemble those found" at Frontier's facility," id. at ¶ 55, and that chemical testing reveals that the collected pellets are comprised of the same material as those handled by Frontier, id. at ¶ 56. Further, the complaint alleges that plaintiffs continue to find spilled pellets throughout the Charleston Harbor Watershed. Id. at ¶ 58. Plaintiffs filed this action on March 18, 2020, asserting two claims under the RCRA and the CWA, respectively, and requesting injunctive relief, the imposition of civil penalties, and an award of litigation costs and attorney's fees.

The Ports Authority is "an instrumentality of the State" of South Carolina that possesses "the powers of a body corporate" and owns and operates the state's public seaport facilities. S.C. Code Ann. §§ 54-3-130, 140. The Ports Authority is not a party to this lawsuit but has been subpoenaed by plaintiffs to participate in discovery. On

August 5, 2020, plaintiffs served the Ports Authority with a subpoena, commanding it to produce

> all documents [ ] relating to alleged release(s) of plastic pellets into the environment from any property owned by [the Ports Authority], including Union Pier; all documents exchanged with any employee or representative of Frontier Logistics, L.P., SCDHEC, or any other entity relating to plastic pellet pollution in Charleston waters[.]

ECF No. 29-4 at 1. The Ports Authority declined to comply with the subpoena based on its assertion of state sovereign immunity and encouraged plaintiffs to instead file a request for the desired records under the South Carolina Freedom of Information Act ("SCFOIA"). Plaintiffs likewise declined to transmute their subpoena into an SCFIOA request and noted their intention to file a motion to compel the Ports Authority's compliance with the subpoena.

On August 19, 2020, the Ports Authority filed a motion to quash the subpoena. ECF No. 29. After the parties fully briefed the motion and presented oral arguments at a September 17, 2020 hearing, the court denied the motion, holding that "doctrine of state sovereign immunity does not preclude a court from enforcing the subpoena against the Ports Authority or any of its employees." (the "September 21 Order"). ECF No. 40 at 8.[1] On October 9, 2020, the Ports Authority appealed the September 21 Order to the Fourth Circuit, requesting review of the court's holding that the Ports Authority "was not protected by sovereign immunity and was required to respond to a subpoena." ECF No.

---

[1] In the September 21 Order, the court also denied Frontier's motion for judgment on the pleadings and motion to strike. In the instant motion, the Ports Authority requests that the court stay the September 21 Order only with respect to that order's resolution of the motion to quash. Therefore, in this order, the court's use of the label "September 21 Order" refers to that order's denial of the motion to quash, ECF No. 40 at 6–13, and not that order's resolution of Frontier's motions.

4

41 at 1. The same day, the Ports Authority filed a motion to stay the September 21 Order until the Fourth Circuit resolved the appeal. ECF No. 42. On October 20, 2020, plaintiffs responded to the motion, ECF No. 45, and on October 27, 2020, the Ports Authority replied, ECF No. 46. The court held a hearing on the motion on November 5, 2020, making the motion ripe for the court's review.

## II.   STANDARD

"A court has the power to stay proceedings, which is 'incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'" Cty. of Charleston, S.C. v. Finish Line Found. II Inc., 2018 WL 3303197, at *2 (D.S.C. July 5, 2018) (quoting Landis v. N. Am. Co., 299 U.S. 248, 254 (1936)). In considering whether to grant a discretionary stay, the court "must weigh competing interests and maintain an even balance." Landis, 299 U.S. at 254, 255 (citing Kansas City S. Ry. Co. v. United States, 282 U.S. 760, 763 (1931)).

## III.   DISCUSSION

In its motion, the Ports Authority requests that the court issue "a stay from enforcement of any third-party subpoenas requesting documents and testimony from the Ports Authority and its officials." ECF No. 41 at 1. The Ports Authority argues that it is entitled to a stay of the court's September 21 Order because federal courts routinely stay proceedings while an appeal to resolve the issue of sovereign immunity is pending. In response, plaintiffs contend that the relevant factors militate against granting a stay because the Ports Authority's interlocutory appeal is procedurally improper and

substantively meritless.  Because the court finds that the relevant factors weigh against granting a stay, it denies the motion.

### A.  Applicable Standard

As a threshold issue, the court must determine the law to apply.  The Ports Authority urges the court to stay proceedings if it finds that the Ports Authority's appeal is "not frivolous."  ECF No. 42 at 3.  Plaintiffs contend that the frivolity standard is inapplicable and instead ask the court to employ the traditional factors under Hilton v. Braunskill, 481 U.S. 770, 776 (1987).  Upon review, the court agrees with plaintiffs.

Under the Ports Authority's proposed standard, a district court should stay proceedings when a state actor appeals an order denying the state actor's immunity defense so long as the immunity-based appeal is "not frivolous."  In support, the Ports Authority relies on a number of cases, each of which is related to the issue at hand but not directly on point.  The court declines to follow their guidance for several reasons.  First, the vast majority of the cases on which the Ports Authority relies concern the issue of qualified immunity, not sovereign immunity.  See K.M. v. Alabama Dep't of Youth Servs., 209 F.R.D. 493, 495 (M.D. Ala. 2002), aff'd sub nom. 73 F. App'x 386 (11th Cir. 2003) ("Once the qualified immunity defense is raised, 'balancing is done with a thumb on the side of the scale weighing against discovery.'"); Hegarty v. Somerset Cty., 25 F.3d 17, 17–18 (1st Cir. 1994) ("The five officers have taken an immediate interlocutory appeal of the denial of qualified immunity.  These defendants asked the district court to stay discovery in the case while these appeals are pending."); English v. Dyke, 23 F.3d 1086, 1089 (6th Cir. 1994) (considering a stay during the pendency of a qualified-immunity-based appeal).

Secondly, even in the Ports Authority's cases that do involve a sovereign-immunity-based appeal, the appealing parties that requested stays were defendants facing liability, not nonparties facing discovery, as the Ports Authority is here.  See Goshtasby v. Bd. of Trustees of Univ. of Illinois, 123 F.3d 427 (7th Cir. 1997) (staying proceedings in an age discrimination case against a state university pending the defendant-state university's sovereign-immunity-based appeal); Summit Med. Assocs. v. James, 998 F. Supp. 1339, 1340 (M.D. Ala. 1998) (staying proceedings in a constitutional challenge against defendants, an state attorney general and district attorney).  In those cases, the applicants for a stay were facing cognizable claims, which carried with them the promise of months-long discovery, the threat of a lengthy trial, and the possibility of an adverse judgment.  As such, those courts felt that a stay was proper to protect the defendants' potential "right to be free of litigation[.]"  Goshtasby, 123 F.3d at 429.  The stakes of the Ports Authority's sovereign immunity appeal are considerably lower.  The Ports Authority is a nonparty who only faces compliance with a subpoena.  There is no danger here, as there was in Goshtasby, Summit and the qualified immunity cases, that the Ports Authority will wrongly be forced to defend itself at trial or face a legally erroneous judgment.  Instead, the Ports Authority's appeal will determine whether it must produce certain documents, a far cry from the dangers the defendants faced in the cases on which the Ports Authority relies.

Relatedly, in the cases on which the Ports Authority relies, there was no doubt that the issue of sovereign immunity was triggered by the filing of "a suit against the sovereign."  Dugan v. Rank, 372 U.S. 609, 620 (1963); see Goshtasby, 123 F.3d at 427 (finding that the suit against the defendant-state university triggered sovereign immunity

but that § 5 of the Fourteenth Amendment nevertheless authorized the suit); Summit, 998 F. Supp. at 1340 (finding that the suit against state officials triggered sovereign immunity but that defendants fell within the purview of the exception set forth in Ex parte Young, 209 U.S. 123 (1908)). Here, conversely, the Ports Authority faces a third-party subpoena, not a lawsuit, and the court has already found that the subpoena does not constitute a "suit against the sovereign" and thus does not threaten sovereign immunity. ECF No. 40 at 13. As the court found in the September 21 Order, unlike the suit against the state in Goshtasby and Summit, the subpoena served upon the Ports Authority "does not implicate significant federalism concerns." Id. at 12. Whatever minor federalism concerns that are implicated here by compelling the Ports Authority to comply with a federal third-party subpoena pale in comparison to those that arise from outright "suit[s] against the sovereign." Dugan, 372 U.S. at 620. And, as the court determined in the September 21 Order, the Ports Authority's compliance with the subpoena comports with a constitutional bedrock of like importance, the Supremacy Clause. Id. at 10–11. Moreover, the defendants in the cases cited by the Ports Authority had a clear right to filing an interlocutory appeal, and, as the court discusses in greater depth below, the Ports Authority's right to appeal the September 21 Order is a much more dubious proposition. Thus, the court rejects the Ports Authority's proposed "frivolity" standard and instead utilizes the traditional Hilton factors in resolving the motion to stay.

**B. Motion to Stay**

When considering a motion to stay proceedings, the Supreme Court instructs courts to consider four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably

injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

Hilton v. Braunskill, 481 U.S. 770, 776 (1987). Furthermore, "[t]he party seeking a stay must justify it by clear and convincing circumstances outweighing potential harm to the party against whom it is operative. Williford v. Armstrong World Indus., Inc., 715 F.2d 124, 127 (4th Cir. 1983). The court considers each factor in turn.

### 1. Likelihood of Success on the Merits

The Ports Authority contends that it has filed a procedurally valid appeal that will likely succeed on the merits before the Fourth Circuit. In response, plaintiffs argue that the Ports Authority's appeal is flawed both procedurally and substantively. Finding law on both sides of the ledger with respect to procedure and substance, the court finds that the first Hilton factor weighs neither for nor against a stay.

First, the procedure. Defendants contend that the September 21 Order is immediately appealable under the collateral order doctrine. However, most of the authority the Ports Authority cites in support suffers from a familiar flaw—the law applies to defendants, not nonparties. See, e.g., Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139 (1993) (finding that the collateral order doctrine applied to a defendant's sovereign-immunity-based appeal). In its supplemental brief, the Ports Authority brings the court's attention to two cases from the Fifth and Eleventh Circuits which do provide direct support for its position. Relying on Fifth Circuit precedent,[2] the Eleventh Circuit stated, "[O]ne who unsuccessfully asserts a

---

[2] The Eleventh Circuit relied without analysis on Fifth Circuit precedent because the Fifth Circuit decision was issued when its jurisdiction included some states that now sit within the the current Eleventh Circuit. See In re Hubbard, 803 F.3d at 1315 n.6 (11th

9

governmental privilege may immediately appeal a discovery order where he is not a party to the lawsuit." In re Hubbard, 803 F.3d 1298, 1305 (11th Cir. 2015) (citing Branch v. Phillips Petroleum Co., 638 F.2d 873, 877 (5th Cir. Unit A 1981). While this law directly supports the Ports Authority's position that its appeal is procedurally valid, the law of the Eleventh Circuit is not binding in the Fourth Circuit, and the Eleventh Circuit's limited analysis in Hubbard fails to instill in the court any confidence that the Fourth Circuit would adopt the same position.

In fact, binding Fourth Circuit precedent suggests otherwise. As plaintiffs point out, the Ports Authority's appeal of the September 21 Order does not fit cleanly within the collateral order doctrine, which requires that the appealed order "be effectively unreviewable on appeal from a final judgment." United States ex rel. Lutz v. United States, 853 F.3d 131, 137 (4th Cir. 2017). The September 21 Order fails in this regard, plaintiffs contend, because the Ports Authority has a clear avenue to obtain review. The Ports Authority would no doubt be entitled to appellate review of its sovereign immunity defense if it refused to comply with the subpoena and was held in contempt. Indeed, in the Fourth Circuit, "a person served with a subpoena is not entitled to appeal the denial of a motion to quash without first resisting the subpoena and being held in contempt." In re Grand Jury Subpoena John Doe, 584 F.3d 175, 182 (4th Cir. 2009). And while contempt may seem a drastic avenue for obtaining review, the difficulty of obtaining appellate review of discovery matters is "deliberate." MDK, Inc. v. Mike's Train House, Inc., 27 F.3d 116, 121 (4th Cir. 1994) ("[W]e recognize, of course, that the contempt route is a

---

Cir. 2015) ("[W]e [have] we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.").

difficult path to appellate review, and one that may carry with it a significant penalty for failure. In discovery disputes, however, this difficulty is deliberate."). As such, whether the Ports Authority's appeal is procedurally viable is a close question. Thankfully, the court need not resolve it here, other than to say that the law does not weigh strongly in favor of either party.[3]

The same goes for the appeal's substance. The court has already made its opinion on the Ports Authority's claim to sovereign immunity clear in the September 21 Order and therefore need not recapitulate it here. At the same time, the court acknowledges, as it did in the September 21 Order, that whether a state agency is immune from a federal subpoena is an issue of first impression in the Fourth Circuit. And while the law on which the court relied is compelling, it is far from ubiquitous. As such, the court cannot predict with confidence how the Fourth Circuit will resolve the issue, meaning that the appeal's likelihood of success on the merits is unclear. Thus, the court finds that the first Hilton factor weighs neither in favor nor against granting a stay.

### 2. Irreparable Injury to Applicant

The court next considers whether the Ports Authority will suffer irreparable harm absent a stay. The Ports Authority notes that it would be irreparably harmed in the absence of a stay because it would "be forced to choose between (1) giving up its appeal, which would be rendered moot, or (2) facing contempt proceedings." ECF No. 42 at 7. To be sure, some courts have found that a party's decision to abandon an appeal or face

---

[3] Alternatively, the Ports Authority suggests that the court "certify [the September 21] Order as final" pursuant to Fed. R. Civ. P. 54(b) and "obviate the need to determine whether the collateral order doctrine applies." ECF No. 46 at 6. Given that Rule 54(b) applies to orders that resolve the "claims" of "parties", the court declines to certify as final the September 21 Order, which resolves a discovery dispute against a nonparty.

11

contempt constitutes an irreparable injury.  See N.L.R.B. v. Gen. Motors Corp., 510 F. Supp. 341, 342 (S.D. Ohio 1980) (finding that "absent clear harm to other persons and the public interest," a stay was appropriate during the pendency of a party's appeal).  In this case, however, the court fails to see how the Ports Authority's purported injury is either irreparable or particularly injurious.  As plaintiffs point out, the Ports Authority can choose not to comply with the subpoena, be placed in contempt, and then appeal the contempt order as a proper prejudgment appeal.  ECF No. 45 at 8–9.  Further, contempt in this case would result in an imposition of monetary fines, which courts generally decline to find irreparably injurious.  See Brenntag Int'l Chemicals, Inc. v. Bank of India, 175 F.3d 245, 249 (2d Cir. 1999) ("As a general matter, because monetary injury can be estimated and compensated, the likelihood of such injury usually does not constitute irreparable harm."); Columbia Gas Transmission, LLC v. 84.53 Acres of Land, More or Less, In Calhoun, Marshall, Ritchie, Tyler, & Wetzel Ctys., W. Virginia, 310 F. Supp. 3d 685, 692 (N.D.W. Va. 2018) ("[I]t is beyond dispute that economic losses generally do not constitute irreparable harm, [based on] the assumption that economic losses are recoverable.").  And finally, as a practical matter, the ultimate injury the Ports Authority faces is not the abandonment of an appeal, but the production of certain documents. The Ports Authority does not explain how the production of these documents would cause injury in this case, and the court has already ordered the Ports Authority to produce them.[4]  As such, the Ports Authority will not suffer an irreparable injury in the absence of the requested stay, which weighs against the court indulging its request.

---

[4] Moreover, the Ports Authority represented to the court in a hearing on the motion to quash that the documents it would produce in response to the challenged

### 3. Substantial Injury to Other Parties

The third Hilton factor weighs decidedly against a stay. Plaintiffs served the challenged subpoena on the Ports Authority on August 5, 2020. After a month and a half of failing to comply therewith, the court ordered the Ports Authority's compliance. Now, another two-and-a-half months have passed, and the Ports Authority still refuses compliance. This delay in discovery is particularly injurious where, as here, plaintiffs allege ongoing harms and seek injunctive relief. The Ports Authority owns the pier on which Frontier runs its facility and therefore may possess discovery relevant to Frontier's operations, which lie at the heart of this matter. As such, the court finds that the Ports Authority's failure to comply with the subpoena has injured plaintiffs, and it declines to further prolong that injury with additional delay.

### 4. The Public Interest

Likewise, the public interest lies firmly against the issuance of a stay. Plaintiffs have brought this action under the citizen-suit provisions of the Resource Conservation and Recovery Act and the Clean Water Act, which empower the public to enjoin damaging activities of private actors. Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 61 (1987) (describing the citizen-suit provision as an "abatement" measure). In other words, plaintiffs have brought a lawsuit under laws designed explicitly for the benefit of the public at large. The public benefits from such lawsuits, which seek to enjoin activities that are allegedly damaging to the environment, and further delay in this action would adversely affect that public benefit. Further, the

---

subpoena would be the same as those it would produce in response to a like FOIA request. As such, the "injury" the Ports Authority claims is even less dire.

public interest lies in favor of governmental transparency, which would also be undermined by a stay. Therefore, the court finds that the public interest here weighs strongly against a stay. As such, the Ports Authority has failed to justify a stay "by clear and convincing circumstances outweighing potential harm" to plaintiffs. Williford, 715 F.2d at 127. For these reasons, the court declines to enter a stay and orders that the Ports Authority comply with plaintiffs' subpoena and additional third-party discovery requests in this action.[5]

## IV.   CONCLUSION

For the foregoing reasons the court **DENIES** the motion to stay and **ORDERS** the Ports Authority to comply with plaintiffs' discovery requests.

**AND IT IS SO ORDERED.**

_____
**DAVID C. NORTON
UNITED STATES DISTRICT JUDGE**

**December 14, 2020
Charleston, South Carolina**

---

[5] Plaintiffs also argue that even if sovereign immunity extends to the Ports Authority, it does not extend to agency officials in their individual capacity under Ex parte Young, 209 U.S. 123 (1908). Therefore, plaintiffs conclude, even if the court determines that a stay is warranted, such a stay would only apply to subpoenas served upon the Ports Authority and not those served upon its employees. Because it finds that a stay is not warranted, the court need not confront this issue.